**TERRA INTERNATIONAL, INC.,
a Delaware corporation,
Plaintiff,**

v.

**MISSISSIPPI CHEMICAL CORPO-
RATION, a Mississippi corpora-
tion, Defendant.**

No. C 95–4088.

United States District Court,
N.D. Iowa,
Western Division.

Jan. 25, 1996.

Gregg Williams, local counsel of Heidman, Redmond, Fredregill, Patterson, Schatz & Plaza, L.L.P., Sioux City, Iowa, and George Zelcs and Dean S. Rauchwerger of Clausen Miller, P.C., Chicago, Illinois, and Terrence C. McRea of Zelle & Larson, Dallas, Texas, for Plaintiff Terra International.

Steve Eckley and Randy Duncan, local counsel of Duncan, Green, Brown, Langeness & Eckley, P.C., Des Moines, Iowa, Jay Brumfield, general counsel Jackson, Mississippi, and William L. Smith, of Brunini, Grantham, Grower & Hewes, Jackson, Mississippi, for Defendant MCC.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR DISCOVERY GUIDANCE

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND....................................1308
   A. Procedural Background ...........................................1308
   B. Factual Background ..............................................1310

II. LEGAL ANALYSIS ....................................................1313
   A. Governing Ethical Standards ....................................1313
   B. Contact With Former Employees .................................1314
   C. Contact With Current Employees ................................1316
      1. "Automatic representation" ................................1316
      2. Nature or status of employment ...........................1317
         a. Total bans ............................................1318
         b. Limited contacts......................................1319
      3. Analysis here ............................................1320
   D. Guidelines For Ex Parte Contacts ...............................1323
III. CONCLUSION .......................................................1323

BENNETT, District Judge.

This ruling represents another small step in the litigation following the catastrophic explosion of a fertilizer plant in northwest Iowa on December 13, 1994, in which four persons were killed, eighteen were injured, and the fertilizer plant and its owner sustained enormous damage alleged to exceed $200 million. In this litigation, the plaintiff corporation is the operator of the fertilizer plant and the defendant corporation is the inventor, designer, and licensor of the ammonium nitrate neutralizer technology that allegedly precipitated the explosion. The roles of the parties here are reversed in parallel litigation brought by the defendant here in federal court in Mississippi. The present discovery dispute is a microcosm of sorts of the bigger dispute, because each party has again accused the other of wrong-doing based on the same set of circumstances. Following pointed allegations by plaintiff's counsel that counsel for the defendant corporation was violating ethical standards by allegedly contacting or attempting to contact current and former employees of the plaintiff corporation, the defendant corporation accused plaintiff's counsel of impeding proper investigation of the catastrophe. This dis-covery dispute comes before the court on defendant's motion for discovery guidance, followed by an evidentiary hearing on January 15, 1996.

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

This lawsuit, filed on August 31, 1995, arises from the explosion of plaintiff Terra International's fertilizer plant in Port Neal, Iowa, on December 13, 1994. Also on August 31, 1995, just a few hours after Terra's suit was filed in this district, defendant Mississippi Chemical Corporation (MCC) instituted parallel litigation in the United States District Court for the Southern District of Mississippi, Western Division, in a case captioned *Mississippi Chem. Corp. v. Terra Int'l, Inc.*, No. 5:95CV127 (S.D.Miss.). In a prior ruling in this case, the court granted Terra's application for a temporary restraining order enjoining MCC from seeking an injunction or restraining order in the litigation it had filed in the Mississippi federal court or in any other litigation MCC may file in Mississippi or elsewhere enjoining in any way the present lawsuit between the parties in the United States District Court for the

Northern District of Iowa. *See Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 896 F.Supp. 1468 (N.D.Iowa 1995).[1] In that ruling, the court considered in some detail the background to and claims asserted in this litigation, as well as the nature of the claims asserted in the parallel litigation instituted by MCC. *Terra Int'l, Inc.*, 896 F.Supp. at 1467–72. The court will therefore focus here on the procedural and factual background immediately related to MCC's motion for discovery guidance.

Following an exchange of letters in which counsel for Terra accused MCC of improperly contacting current and former employees of Terra *ex parte*, and MCC accused Terra of interfering with its legitimate efforts to contact former employees, MCC filed its motion for discovery guidance on December 28, 1995. In its motion, amplified by an accompanying brief, MCC seeks authority from the court to pursue *ex parte* contacts with all former employees, and all current employees of Terra except those who are (1) corporate parties whose acts or omissions in the matter are binding on the corporation; (2) parties who may impute liability to the corporation; or (3) employees who act at the instruction or advice of corporate counsel, citing *Niesig v. Team I*, 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030, 1036 (1990). Terra responded to the motion for discovery guidance on January 4, 1996, and filed an amended response later that same day, but has not specifically moved for a protective order of any kind. In its response, Terra asserts that *ex parte* contacts with current and former employees are either improper or should not be allowed to proceed without limitations. Terra also requested that MCC be required to turn over any materials gathered in the course of *ex parte* contacts with its employees.

The court held a telephonic status conference with the parties concerning their discovery dispute on Saturday, January 6, 1996, and scheduled an evidentiary hearing on the matter for January 15, 1996.[2] At that hearing, plaintiff Terra International was represented by local counsel Gregg Williams of Heidman, Redmond, Fredregill, Patterson, Schatz & Plaza, L.L.P., in Sioux City, Iowa, and by counsel George Zelcs and Dean S. Rauchwerger of Clausen Miller, P.C., in Chicago, Illinois, and Terrence C. McRea of Zelle & Larson, in Dallas, Texas. Defendant MCC was represented by its local counsel, Steve Eckley and Randy Duncan of Duncan, Green, Brown, Langeness & Eckley, P.C., in Des Moines, Iowa, and by its general counsel Jay Brumfield, of Jackson, Mississippi, and by attorney William L. Smith, of Brunini, Grantham, Grower & Hewes in Jackson, Mississippi. The court appreciates the parties', counsels', and witnesses' accommodation of the court's packed calendar by appearing for a hearing on a federal holiday.

Principally at issue is MCC's desire to contact *ex parte* eighteen current employees of Terra who have settled their personal injury claims against MCC. At the January 15, 1996, hearing, Terra stated that it would allow without limitation *ex parte* contacts with six of those employees after those employees received settlement checks from MCC,[3] but that it continued to assert that *ex parte* contacts with any other current or former employees were inappropriate. Specifically, Terra seeks to preclude *ex parte* contacts with twelve current employees who have settled their claims against MCC, all of whom were working at the Port Neal plant at the time of the explosion. The parties agreed at the hearing that no further efforts would be made to make *ex parte* or other contacts with Don Romig, the person at the focus of the contacts that precipitated this

1.  However, the court specifically stated that the TRO was to have no effect on discovery or on the parties' ability to file motions to transfer or dismiss, or on any other action in any lawsuit.

2.  The hearing on January 15, 1996, had previously been scheduled to consider Terra's motion for a permanent injunction enjoining MCC's lawsuit in federal court in Mississippi and MCC's motion to transfer this litigation to the United States District Court for the Southern District of

Mississippi, Western Division. Although the court heard these matters as well on January 15, 1996, they will be disposed of in a separate ruling to follow.

3.  The persons Terra agreed could be contacted *ex parte* were Lyle Feucht, Rich Harrington, Caroll Stokes, and Randy Limoges, all production technicians in the ammonia production facility, Duwayne Rich, a maintenance technician, and Ted Mercural, a shipping technician.

discovery dispute, until Mr. Romig is formally deposed. The parties also agreed to drop their complaints against each other concerning past contacts or impediments to contacts with Mr. Romig or other employees.

At the January 15, 1996, hearing, the parties presented several exhibits and the testimony of two witnesses pertinent to the discovery issue presently before the court. MCC presented the testimony of James E. Mazour, a private investigator it had employed to investigate matters pertaining to this lawsuit. Terra presented the testimony of Larry Chapman, the Production Superintendent for Terra's Port Neal plant. The parties requested, and the court granted, leave to file supplemental briefs on the discovery dispute after the hearing. Those briefs were received on January 22, 1996. This matter is therefore submitted in its entirety.

### B. *Factual Background*

The following factual background is based upon the evidence of record, including exhibits submitted with the discovery motion, the response to that motion, and during the January 15, 1996, hearing, as well as the testimony of the witnesses heard at the hearing.

Other litigation against MCC besides this lawsuit by Terra was commenced as a result of the explosion of the Port Neal plant. However, MCC has reached a settlement agreement resolving the wrongful death and personal injury actions brought against it by Terra employees and their families. Final approval of that settlement by the Iowa Industrial Commissioner pursuant to Iowa Code §§ 85.22(3) and (4) is still pending, but the parties anticipate that final payment of settlement monies will be made on or about February 1, 1996. All of the current Terra employees MCC has indicated a desire to contact *ex parte,* and all of the people Terra seeks to shield from such contacts, are settling plaintiffs in the Terra employees' personal injury suit against MCC.

On December 21, 1995, counsel for MCC received correspondence from counsel for Terra alleging that MCC's counsel and representatives had been contacting current employees of Terra in violation of the applicable canons of ethics, including Iowa Disciplinary Rule 7–104.[4] In that correspondence, Terra

4. The body of the letter from Terra's counsel to MCC's counsel reads as follows:

We were quite shocked to learn that your firm has contacted one or more current Terra employees to interview them regarding operations at Terra's Port Neal plant. As you well know, all Terra employees are represented by counsel and any contacts by MCC, or its representatives, with current Terra employees violates Iowa Disciplinary Rule 7–104 and traditional ethical guidelines. Such unscrupulous conduct is not only improper, but also evidences a deliberate attempt to conduct unauthorized communications with individuals represented by counsel and to disregard the attorney-client relationship and secure privileged information.

We demand that you cease and desist any further contacts, verbal or otherwise, with any of Terra's current employees, and any former employees represented by counsel. Please instruct your staff not to pursue any such contacts without written consent of counsel. We also demand that you advise us fully, in writing, regarding the complete extent and nature of all of your contacts with Terra employees. Your written statement should include copies of all memoranda generated from such contacts, as well as full disclosure of all individuals/parties who were informed of (1) your contacts and (2) substance of your discussions.

Terra considers this a serious matter and expects MCC and its counsel/investigators to fully adhere to the ethical requirements. We request that you today confirm in writing MCC's intention to cease any further contacts with Terra's current employees and former employees represented by counsel, otherwise we will be forced to pursue all appropriate remedies, including notification of the Court and the appropriate Iowa bar authorities.

During the telephone conference on January 6, 1996, the court chastised one of Terra's out-of-state counsel who had authored the December 21, 1995, letter for the letter's accusatory and inflammatory tone, which the court believes much overstates the facts. The court reiterates its concerns here. The court finds that the tone of the December 21, 1995, letter could only have escalated tension and distrust between counsel who had hitherto gotten along well and had conducted this complicated and expensive lawsuit with complete professionalism. The court hopes that the tone of Terra's December 21, 1995, letter and of MCC's December 22, 1995, response is not a fearful harbinger of an acrimonious relationship between counsel during the remainder of this lawsuit. The court will do everything in its power to ensure that this litigation is conducted in an atmosphere of professionalism and civility.

asserted that all current employees of Terra are represented by Terra's counsel, and that *ex parte* contacts with those employees by MCC's representatives are therefore improper. Terra also demanded an accounting by MCC of all contacts its representatives had thus far had with Terra employees.

Counsel for MCC responded on December 22, 1995,[5] by informing Terra that no lawyer for MCC had contacted any Terra employees. MCC further advised Terra that one of its investigators, James Mazour, had contacted *former* employees of Terra, but when that investigator was informed by one person he contacted, Calvin Towne, that Mr. Towne was a current employee of Terra, Mr. Mazour immediately ended the contact.

MCC asserted improper conduct on the part of Terra as well in its December 22, 1995, correspondence. MCC stated that its investigator, Mr. Mazour, had contacted Don Romig, whom MCC characterized as an "ex-employee," although MCC acknowledged that Terra had listed Mr. Romig as a current employee. MCC asserted that Mr. Romig had been contacted by Terra, offered representation by Terra's counsel, and told not to talk to MCC's representatives. MCC assert-

ed that Mr. Romig told its investigator that he did not want to be represented by Terra and resented a letter from Terra's counsel "confirming" an agreement to represent him. MCC asserted that it was perfectly within its rights to contact former employees, and that MCC had every intention of contacting those employees who have settled with MCC. MCC also indicated its intention to file a motion for discovery guidance.

Although contacts with Mr. Romig precipitated the present discovery dispute, the parties have resolved the manner in which future contacts with Mr. Romig will be conducted and have dropped any complaints either had about the other with regard to Mr. Romig. Also, having explored at the hearing the nature of the contact Mr. Mazour had with Mr. Towne, Terra conceded that there was nothing about that contact that required the court's further consideration. Furthermore, Terra has now offered *ex parte* contacts with six of its current employees subject only to the limitation that the contacts not take place until after those six current employees receive settlement checks from MCC. Thus, the critical factual issues pertaining to the present discovery

5. The body of MCC's response letter of December 22, 1995, reads as follows:

Concerning your letter to me of December 21, 1995, I wish to inform you of the following:
1. No member of my law firm nor any law firms representing MCC have talked to any Terra employees.
2. James Mazour, a private investigator hired on behalf of MCC has talked to Terra ex-employees only.
3. At my request, Mr. Mazour has reviewed his investigating file and finds the only employee of Terra that he had any conversation with was Calvin Towne. Mr. Mazour called Calvin Towne on the night of December 19, 1995, and told Mr. Towne that he was calling former employees of Terra. When Mr. Towne told Mr. Mazour that he was a current employee of Terra, Mr. Mazour ceased telephonic contact and did not talk to him further.
4. Please list all current employees of Terra who you say were contacted by MCC representatives and the name of who they were contacted by. Further list all former employees who were represented by counsel when MCC allegedly contacted them.
What is more relevant and to the point, however, is what we consider to be very close to an obstruction of justice by yourself. Mr.

Mazour has contacted ex-employee (listed by you as an employee) Don Romig. Mr. Romig told Mr. Mazour that you had offered to represent him for nothing and that Romig should not talk to any representative of MCC without first contacting you. Mr. Romig has told Mr. Mazour that he did not want you to represent him, nor did he ask you to represent him and he is offended by the fact that you wrote him this letter (which we have in our possession).

I invite you to review the law concerning contacts with ex-employees. I believe you will find that Iowa permits contact with ex-employees. Please see the excellent decision by Judge Mark Bennett located at 148 F.R.D. 259.

This is to inform you that those employees who have settled with MCC will be contacted by representatives of MCC and we intend to talk to them. In connection with this in mind, I intend to put this entire matter before Judge Mark Bennett so that he knows what has transpired and I will be asking for guidance from him concerning our rights to investigate this unfortunate explosion. Terra will not be allowed to hide the facts concerning this incident.

Your letter to me was entirely inappropriate and constitutes a breach of the professionalism and civility that I would expect from you. I would think an apology is in order.

dispute involve the status and role in the company of the twelve current employees MCC has stated a desire to contact *ex parte* and Terra seeks to shield from such contacts. These twelve people are members of the production shift working at the time of the explosion in the "urea" or UAN [6] unit, which was the unit in which the explosion is believed to have occurred, surviving members of the maintenance crew that had effected repairs in the nitric acid unit, part of the UAN unit, shortly before the explosion,[7] stores and parts warehouse personnel responsible for providing parts to the maintenance crew, the shipping supervisor, and laboratory technicians who took samples during the course of the shift in which the explosion occurred.

MCC seeks authorization for *ex parte* contact with the following members of the production shift working at the time of the explosion in the UAN unit: Mick Ashley, the acting supervisor of the shift, Kevin Braun, Jim Edwards, Jeff Grell, and Bert Huot, all production technicians. Based on the testimony of Larry Chapman, the court finds that all of these workers were actively involved in operation of the UAN unit at or around the time of the explosion that is believed to have occurred in the ammonium nitrate "sparger" or neutralizer of that unit. Although the unit had been shutdown at about 4:00 or 5:30 a.m. on December 12, 1994, the day before the explosion, owing to repairs to a gasket in the nitric acid unit which provides one of the feed chemicals to the UAN unit, and was only restarted shortly before the explosion, steam was still being fed through the UAN unit to prevent that unit from "salting up" with ammonium nitrate, which can harden from its liquid state if high enough temperatures are not maintained. The production technicians were therefore involved in monitoring control systems in the control center and they were also involved outside of the control center in continuing, physical status checks and measurements on equipment, pressures, flows, and temperatures in the UAN unit itself. They were also involved in the restarting of the UAN unit after repairs to the nitric acid unit were completed, which occurred just before the explosion.

The surviving members of the maintenance crew that had effected repairs in the nitric acid unit include Ron Peters and Kevin Peterson. A third person, Randy Mosher, although not technically part of the maintenance group, but instead employed in the stores warehouse, is considered here, because he was actively involved in providing parts to the maintenance group. Duwayne Rich, another maintenance employee working at the time of the explosion, has been offered by Terra for *ex parte* contacts with MCC, because Terra has concluded that he can make no admissions binding on Terra nor can any of his conduct impute liability to Terra. Mr. Peters was a general maintenance technician who had, among other things, been involved in maintenance in the ammonium nitrate production unit. He had therefore worked on equipment involved in the explosion, and was specifically involved in the repairs in the nitric acid unit just before the explosion. At the time of the explosion, however, he was in the maintenance building, and therefore survived. Mr. Peterson was involved in the maintenance and repair of any controlling equipment, and specifically was the person who calibrated pH probes in the UAN plant. The monitoring of the pH levels in the neutralizer that is the focus of the investigation of the explosion was of critical importance to the proper operation of the UAN unit. Mr. Mosher was in charge of providing parts to the maintenance crew. He would have known what parts and whether new or reconditioned, and whether substituted, modified, or altered, were used in the repairs to the nitric acid unit.

Although Terra has agreed to *ex parte* contacts by MCC with Ted Mercural, a shipping technician working at the time of the explosion, it seeks to preclude such contacts with the shipping supervisor, Vernon Wing. Mr. Wing supervised up to seven persons per shift, and occupied a salaried, lower managerial position.

---

6. Urea, itself an ammonia product, is combined with other nitrate products to produce a nitrogen product called UAN.

7. Four members of that crew were killed in the explosion.

The final group of employees about which there is a discovery dispute is the laboratory technicians from the engineering and environmental group at Terra's Port Neal plant working at the time of the explosion. These laboratory technicians are Charles Hudson and Jack Weiland. There duties during the course of any shift included drawing or collecting samples drawn by other technicians, then analyzing these samples to determine, *inter alia*, whether the quality of water used for steam production was appropriate, and whether the samples reflected the proper composition of feed chemicals and end products to ensure safe production and "shippable quality" of products. They performed several hundred analyses daily.

As MCC demonstrated in its cross-examination of Mr. Chapman, with the exception of Vernon Wing, none of these employees had the power to hire or fire anyone, and none had the power to set policy for the company. However, all were directly involved in critical operations or maintenance of the UAN production unit shortly before the explosion giving rise to this lawsuit.

After considering the legal standards applicable to the present discovery dispute, the court will return to the factual question of which current and former employees of Terra fall within the category of employees with whom MCC may permissibly have *ex parte* contacts, and which fall within the category of employees who may be contacted only with Terra's representatives present, pursuant to formal discovery procedures.

## II. LEGAL ANALYSIS

### *(Including Some Ultimate Findings Of Fact)*

In resolving this discovery dispute, the court will first consider the ethical standards applicable to contacts by counsel for one party with employees of an opposing corporate party. The court will then turn, albeit only briefly, to the question of what effect these ethical standards have upon contacts with former employees, then to the more vexing question, in light of this case, of the effect these standards have on contacts with current employees. Finally, if the court concludes that *ex parte* contacts may be made, the court will also consider what guidelines for such contacts are appropriate in this case.

### A. *Governing Ethical Standards*

■ As I observed in a prior ruling while a magistrate judge in our sister district, the ethical standards applicable to contacts between counsel for one party and employees of another party are governed, at least generally, by DR 7–104(A)(1) of the Code of Professional Responsibility (CPR), which has been adopted in Iowa as part of the Iowa Code of Professional Responsibility for Lawyers (ICPRL), and the nearly identical rule found in Rule 4.2 of the Model Rules of Professional Conduct (MRPC). *See Cram v. Lamson & Sessions Co., Carlon Div.*, 148 F.R.D. 259 (S.D.Iowa 1993). The CPR and ICPRL rule provides as follows:

> During the course of his representation of a client a lawyer shall not ... [c]ommunicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.

ABA Model Code of Professional Responsibility and Iowa Code of Professional Responsibility, Disciplinary Rule 7–104(A)(1). Similarly, the MRPC rule provides as follows:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

Model Rules of Professional Conduct Rule 4.2. Much of the discussion in judicial decisions considering which employees of an opposing party an attorney may contact focuses upon the Comment to Rule 4.2, which states, in pertinent part:

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation *with persons having a managerial responsibility* on behalf of the organization, and with *any other person* whose *act*

*or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability or whose statements may constitute an admission* on the part of the organization. . . .

Comment to MRPC Rule 4.2 (emphasis added). The purposes of these ethical rules include protecting persons from the danger that "unprincipled attorneys" might "exploit[ ] the disparity in legal skills between attorneys and lay people"; protecting the "integrity of the attorney-client relationship"; preventing "the inadvertent disclosure of privileged information"; and advancing dispute settlement by channeling communications between lawyers accustomed to the negotiation process. *Cram,* 148 F.R.D. at 260 (and cases cited therein).

Although these ethical rules frame the discussion, they do not, by themselves, resolve the question of which of Terra's current and former employees MCC is entitled to contact *ex parte* in this case. In resolving similar questions, courts have treated these ethical rules as substantially identical, and, as in *Cram,* the court will be guided here by case law interpreting both rules. *Cram,* 148 F.R.D. at 261.

**B. Contact With Former Employees**

■ In *Cram,* after reviewing the case law that has grown up around both ethical rules, I concluded that neither DR 7–104(A)(1) nor Rule 4.2 entirely precludes *ex parte* communications with former employees of an opposing party, although there were some limitations on contact with former employees of managerial status and other limitations resulting from the attorney-client privilege. *Cram,* 148 F.R.D. at 265–66. In particular, I noted that a former employee no longer

works on the organization's behalf, is unlikely to be represented by the organization's counsel, and unlikely to be a participant in the process leading to resolution of the dispute, *id.* at 260; requiring formal discovery methods rather than informal *ex parte* contacts as the only means of obtaining information would have a deleterious effect on the time and expense necessary to pursue litigation, or even to decide whether to pursue litigation, *id.* at 261; [8] and that former employees do not fit within the definition of a "party" with whom *ex parte* contacts are forbidden. *Id.* at 263. On this last point, I rejected the arguments that former employees are "persons having a managerial responsibility," *id.* at 263 (citing the Comment to Rule 4.2, which identifies this category of persons as ones who must be treated as organizational "parties," and the rule of agency law that a statement of a former agent does not constitute an admission of or bind an organization); and that former employees, even former managerial employees, are not persons whose acts or omissions may be imputed to the organization for purposes of liability or whose statements constitute admissions by the organization. *Id.* at 263–65 (citing, *inter alia,* ABA Committee on Professional Ethics and Professional Responsibility, Formal Opinion 91–359 at 3 (1991), and subsequent cases adopting that opinion).

The court finds no decisions since *Cram* that compel a contrary conclusion here. *See Lang v. Reedy Creek Imp. Dist.,* 888 F.Supp. 1143 (M.D.Fla.1995) (declining to apply a blanket prohibition on *ex parte* contacts with former employees on the authority of *Rentclub v. Transamerica Rental Finance,* 811 F.Supp. 651, 658 (M.D.Fla.1992), *aff'd,* 43 F.3d 1439 (11th Cir.1995), because *Rentclub's*

---

8. In *Cram,* I noted the following:

These policy considerations substantially impact the cost and delay of federal civil litigation. First, if all *ex parte* communications with an opposing party's former employees are prohibited, counsel's attempts at engaging in formal discovery will be sharply curtailed. In most cases, counsel will not have informal access to witnesses with important knowledge of critical facts. Counsel will be unable to assess the merits of a case inexpensively and quickly by contacting these witnesses. Instead, counsel will be forced to file a lawsuit

and engage in time-consuming and expensive formal discovery. Indeed, prohibiting *ex parte* communications with an opposing party's former employees could result in nonmeritorious cases being filed that otherwise would not have been filed, in order to learn information through formal discovery whether to prosecute the particular case. Formal discovery, in turn, can create protracted and quarrelsome discovery disputes which consume finite judicial resources.

*Cram,* 148 F.R.D. at 261.

prohibition involved a high-level employee who was privy to substantial privileged or confidential information; instead, the court allowed such contacts limited only by confidentiality exceptions and certain guidelines for reporting contacts); *Aiken v. Business and Indus. Health Group, Inc.*, 885 F.Supp. 1474 (D.Kan.1995) (ethical rules do not prohibit *ex parte* contacts with former employees, because, unless "party" is construed very broadly, a construction unwarranted by the rule, a former employee with no present relationship to an organization could never be a "party"; the court also cited ABA Formal Opinion 91–359 with approval, and allowed *ex parte* contacts with former employees, finding no case since the ABA Formal Opinion was issued contrary to it, and rejecting the expansion of the meaning of "party" in the official comment to Rule 4.2 as contrary to the plain meaning of the rule); *Browning v. AT & T Paradyne*, 838 F.Supp. 1564, 1567 (M.D.Fla.1993) (also reading *Rentclub*, 811 F.Supp. at 651, as providing a limitation on *ex parte* contacts with former employees only where the former employee was "privy to the corporations legal strategies after his employment had terminated or where a former employee had access to privileged information while employed"); *Rentclub*, 811 F.Supp. at 651 (*ex parte* contacts with former employees only limited where employee was privy to corporate legal strategies after termination or had access to privileged information while employed); *but see In re the Prudential Ins. Co. of Am. Sales Practices Lit.*, 911 F.Supp. 148, (D.N.J.1995) (applying a "control group" test articulated by the New Jersey Supreme Court, drawn from MRPC Rule 4.2, to determine which *former*, as well as current, employees of the opponent could not be contacted *ex parte*, but could instead be contacted only after notice to the opposing party);[9] *United States v. Florida Cities Water Co.*, 1995 WL 340980, 41 ERC 1541 (M.D.Fla. April 26, 1995) (not reported in F.Supp.) (in criminal prosecution for violation of the Clean Water Act, magistrate judge's ruling prohibiting government's *ex parte* contact with defendant's former employees was not "clearly erroneous"; defendant demonstrated an interest in protecting trade secret privileged information, and ruling only required notice and opportunity to be present, and further required the U.S. to advise former employees of their potential criminal liability under the Clean Water Act before pursuing any contact); *Carter–Herman v. City of Philadelphia*, 897 F.Supp. 899, 902 (E.D.Pa.1995) (stating in dicta, without citation of any authority, that Comment to MRPC Rule 4.2, which prohibits *ex parte* contact with any other person whose act or omission in connection with the matter may be imputed to the organization "seems to apply to both present and former employees of the opposing party," but deciding only the question of *ex parte* contact with *current* employees of the opposing party).

Thus, the court concludes that the ethical canons must be read as permitting *ex parte* communications with former employees of an opposing party, with one limited exception. Former employees who are in fact represented by the former employer's counsel, or any counsel, are plainly off limits under the language of the rules. *See* CPR DR 7–104(A)(1) (prohibiting *ex parte* contact with "a party [an attorney] knows to be represented by a lawyer in that matter"); MRPC Rule 4.2 (prohibiting *ex parte* contact with "a party the lawyer knows to be represented by another lawyer in the matter"). Indeed, Terra asserts that MCC should be prohibited from contacting only *represented* former employees. As to representation, the court will distinguish between representation by *Terra's* counsel, as opposed to other representation of a former employee by his or her own, independent counsel, even if the parties have not made such a distinction.[10] At this time,

---

9. The Iowa Supreme Court has not addressed application of DR 7–104(A)(1) to the situation presented here.

10. MCC asserted from time to time that settling current employees would be represented by their own counsel, and therefore contacts by MCC would not be truly *ex parte*. Terra objected to this interpretation, because Terra, quite rightly, did not see representation of any former employee by that employee's own counsel as protecting Terra's interests. However, both MCC's and Terra's arguments miss the mark. The court concludes that there have thus far been no valid grounds asserted for precluding *ex parte* contacts

the court will restrict MCC's contact with former employees of Terra outside of the presence of Terra's counsel only where Terra's counsel actually represents such a former employee.

To assist MCC in complying with this limitation, Terra shall provide MCC within five days of the date of this order a list of all former employees, if any, currently represented by Terra's counsel in this matter. Terra's counsel shall also notify MCC immediately upon obtaining an agreement to represent any other former employee.

As I observed in *Cram*, another limitation on *ex parte* access to former employees arises not from the ethical rules cited above, but from the boundaries of attorney-client privilege. *Cram*, 148 F.R.D. at 265 (citing, *inter alia*, ABA Formal Opinion 91–359 at 3). In that regard, I here adopt the reasoning of the district court in *Hanntz v. Shiley, Inc.*, 766 F.Supp. 258 (D.N.J.1991):

> The attorney-client privilege cannot be used to justify an absolute proscription against *ex parte* communications with former employees. Significantly, the attorney-client privilege exists only to the extent attorney-client confidences are implicated. The attorney-client privilege "only protects disclosures of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." ... [The attorney-client privilege] should restrict only what may be asked during *ex parte* communications.

*Hanntz*, 766 F.Supp. at 270–71. Thus, an attorney communicating with a former employee of the opposing party "may not inquire into privileged attorney-client communications because '[a]ny privilege existing between the former employee and the organization's counsel belongs to the organization, and can only be waived by the organization.'" *Cram*, 148 F.R.D. at 266 (quoting *Sequa Corp. v. Lititech, Inc.*, 807 F.Supp. 653, 668 (D.Colo.1992)). However, Terra has not identified any attorney-client privileged information to which any former employee was privy, although it has asserted that an attorney-client privilege exists as to representation of Mr. Romig. Until and unless the attorney-client privilege is properly asserted, the court will not restrict *ex parte* communications by MCC with any *unrepresented* former employees of Terra.

## C. Contact With Current Employees

In *Cram*, I did not reach the issue of *ex parte* contacts with *current* employees. Therefore, I turn to a more thorough discussion of this issue in this case. When the question is what *ex parte* contacts with current employees should be allowed, courts have uniformly found some limitations apply. The quest of the courts confronted with this issue, I find, has been to determine which current employees necessarily fall within the prohibition on *ex parte* contacts in the ethical rules, by virtue of their status with an organization or the relationship between their employment and the potential liability of their employer, and which current employees do not, and may therefore be contacted *ex parte*.[11]

### 1. "Automatic representation"

Terra asserted in its December 21, 1995, letter to MCC's counsel, and again in its response to the motion for discovery guidance that it represented all of its current employees simply by virtue of their employment with Terra. Therefore, Terra asserted that *ex parte* contact with any of its employees violated the terms of the ethical rules barring such contacts with persons represented by counsel. At the hearing on Janu-

---

with former employees on the basis of the ethical rules. The parties have agreed to the manner in which one former employee, Mr. Romig, may be contacted, and the court has not yet been directed to any other specific case of contacts sought with any other former employee which invokes special circumstances.

**11.** As the court observed in its discussion of former employees, the ethical rules already prohibit *ex parte* contacts with those formally represented by counsel, either the opposing party's counsel or independently by other counsel. In *Cole v. Appalachian Power Co.*, 903 F.Supp. 975, 979 (S.D.W.Va.1995), another district court came to the same conclusion about *current* employees, and the language of the applicable ethical rule here brooks no alternative conclusion.

ary 15, 1996, however, Terra acknowledged that such a broad reading of its representation of current employees was ill-founded.

In *Carter–Herman v. City of Philadelphia*, 897 F.Supp. 899 (E.D.Pa.1995), the court rejected the argument that every employee of the defendant city was automatically a represented party simply by virtue of his or her employment without any initiative on the part of the employee to obtain legal help from the city. *Carter–Herman*, 897 F.Supp. at 903. The court observed that if this were the rule, "an organization could thwart the purpose of Rule 4.2 simply by unilaterally pronouncing its representation of all of its employees." *Id.* Similarly, in *Brown v. St. Joseph County*, 148 F.R.D. 246 (N.D.Ind. 1993), the court concluded that "[r]egardless of how much [an employer] may wish to provide its former and current employees with individual legal representation, an attorney-client relationship cannot be created unilaterally or imposed upon the employees without their consent." *Brown*, 148 F.R.D. at 251.

This court agrees with these rejections of "automatic representation" of all employees, and will not assume that all employees of Terra are represented by Terra's counsel unless they fall within a category of employees who may reasonably be held to be automatically represented or have specifically agreed to be represented by Terra's counsel. The *Carter–Herman* and *Brown* decisions are correct that an employer cannot unilaterally create or impose representation of employees by corporate counsel. Such an "automatic representation" rule would serve no useful purpose, but would instead impede the course of investigation leading to or following the filing of a lawsuit. *See Cram*, 148 F.R.D. at 261 (discussing the economies and benefits resulting from *ex parte* contacts). Furthermore, the court sees the potential for coercive conduct on the part of the employer, either in controlling *ex parte* contacts with opposing counsel to stifle criticism or the revelation of negative evidence or in imposing a blanket representation "agreement" on all employees. To the extent an employer tried to do either of these things, the court may have the inherent power to consider whether formation of the "representation" is a sham designed merely to defeat *ex parte* contacts. Finally, an "automatic representation" rule presents the specter of unnecessary discovery wrangling and sticky determinations of the extent of the representation where employees and employer do not necessarily have identical interests. In the present litigation, the court recognizes that many of Terra's employees may have independent personal injury counsel and the court can conceive of a number of situations in which employees would be entitled to employ their own counsel, and an "automatic representation" rule could trespass on that entitlement. Of course, where an employee is represented by independent counsel, the full strictures of the ethical rules on *ex parte* contacts apply.

The court therefore rejects the "automatic representation" rule originally asserted by Terra here and believes it was improper for Terra to suggest it had such "automatic representation" of its current employees in its December 21, 1995, letter to MCC's counsel. The court appreciates Mr. Williams's concession on behalf of Terra that invocation of the "automatic representation" rule was inappropriate here. The court turns to the question of what employees might belong to the category of employees off limits for *ex parte contacts without necessarily entering into a formal agreement for representation by Terra's counsel.*

### 2. Nature or status of employment

One recent decision considering the issue of *ex parte* contacts with current employees notes both the current trend in the rulings and the difference in treatment of such contacts as compared to *ex parte* contacts with former employees:

Courts which have wrestled with the issue have increasingly gravitated toward the position that current employees should not be interviewed by opposing counsel *ex parte*, but that former employees may be so interviewed. Where *ex parte* interviews with current employees are permitted, only nonmanagerial personnel are usually allowed to be so interviewed. Determining what employees are managerial, however, can be difficult, especially as industry in-

creasingly recognizes the efficiency advantages in many instances of delegation of decisionmaking authority to the working level.

*Chambers v. Capital Cities/ABC,* 159 F.R.D. 441, 443 (S.D.N.Y.1995) (citations omitted). Another court opined that

> the literature concerning *ex parte* interviews of corporate employees is substantial, and it is to be doubted whether further insights with respect to this obviously significant and seemingly complex issue will emerge.... Suffice it to say that various "tests" or standards have evolved, that each has its adherents and that all, seemingly, have been the subject of thoughtful criticism.

*Branham v. Norfolk and Western Ry. Co.,* 151 F.R.D. 67, 68 (S.D.W.Va.1993). Because of these difficulties in drawing lines, and the number of tests proffered to determine which current employees may be contacted *ex parte,* the solutions arrived at by the courts range from total bans on *ex parte* contacts with current employees to carefully circumscribed contacts; this court has located no case whatsoever in which the court authorized unrestricted *ex parte* contacts with current employees. *Cf. Brown,* 148 F.R.D. at 253 (recognizing that in the case of current employees, rules for *ex parte* contacts range from "blanket" bars, to the "scope of employment" test, to the "managing-speaking-agent" test and its variant, the "alter-ego" test, the "control group" test, and the "case-by-case balancing" test, which balances the need for the information against the dangers of generating evidentiary admissions). In all of the cases surveyed by the court, the issues involved in making the determination have included the degree to which the employee might be said to represent, and therefore bind, the company, balanced against the need for *ex parte* contacts as creating significant economies not available through traditional discovery methods. The court will consider some logical groupings of these cases, then determine into which group this case falls.

### a. Total bans

The court finds that there are roughly two kinds of cases in which courts impose total bans on *ex parte* contacts with current employees. The first kind of case involves a ban on *ex parte* contacts, because all of the current employees with whom such contacts are sought are "high level" or "managerial" employees, or distinguishing who has managerial capacity in the company is too complex an issue to be determined except on a case-by-case basis. The second kind of case involves total prohibitions on *ex parte* contacts with current employees, because misconduct of those employees could impute liability to their employer or their statements could be deemed admissions of the employer.

The decision in *Chambers* belongs to the first group of "total ban" decisions. *Chambers,* 159 F.R.D. at 443. The court in *Chambers* upheld a magistrate judge's ruling permitting *ex parte* contacts with *former* employees of the defendant, but refusing to authorize *ex parte* interviews with *current* employees, relegating all discovery from current employees to employment of traditional methods, such as depositions. *Id.* The court suggested that the expense of such depositions could be minimized by agreements not to request transcripts unless "significant evidence is developed," and that preparation of the witness would be a legitimate target for questions in depositions. *Id.* The court apparently concluded that a total ban was necessary, because it was too difficult to determine which employees could bind the company with their statements and which might expose the company to improper disclosure of trade secrets and other proprietary information. *Id.* at 443–444.

The decision in *Lang v. Reedy Creek Imp. Dist.,* 888 F.Supp. 1143 (M.D.Fla.1995), is an example from the second group of "total ban" cases. In *Lang,* the court refused to allow any *ex parte* contacts at all with current employees in Title VII litigation, because it concluded that many of the current employees were alleged to be participants in the alleged sexual discrimination and therefore their acts could impute liability to the employer or, under *Fed.R.Evid.* 801(d)(2), serve as admissions of liability, although the court agreed to make an employee-by-employee review of this conclusion. *Lang,* 888 F.Supp. at 1149. Terra asserts that this case is the

kind of case in which a "total ban" is appropriate, because it is one in which the conduct of any employee may impute liability for inappropriate operations to Terra. MCC argues, just as heatedly, that this is the sort of case in which at least "limited" *ex parte* contacts with current employees should be permitted.

### b. Limited contacts

Other courts have permitted some *ex parte* contacts with current employees, employing various criteria to determine which employees could be so contacted. Having rejected the "automatic representation" rule, the court in *Carter–Herman* found that *ex parte* communications with current employees were nonetheless limited by criteria stated in the Comment to MRPC Rule 4.2.[12] *Carter–Herman*, 897 F.Supp. at 903. Under the Comment, *ex parte* interviews of current employees of the defendant city were allowed only if those employees *did not* have "managerial capacity."[13] The court therefore reviewed the job descriptions of the various ranks of the Philadelphia Police Department, the department of the defendant city in which it was claimed that sexual harassment and retaliation in violation of Title VII had occurred, and determined which of those ranks had "managerial responsibilities," based on their command of an assigned unit or shift, as well as their exercise of significant individual judgment and discretion outside of established policies and procedures. *Id.* (drawing the line above sergeant, on the ground that a sergeant's authority to direct a small squad of officers was "analogous to that of a foreman, whose supervision of a small group of workers would not constitute a managerial position within a corporation"); *and compare Lang*, 888 F.Supp. at 1149 (imposing a total ban in a Title VII case, because the court perceived an imputation of liability from co-workers, regardless of role in the company).

In *Cole v. Appalachian Power Co.*, 903 F.Supp. 975 (S.D.W.Va.1995), the court considered other limitations on *ex parte* contacts with current employees identified in the Comment to Rule 4.2. The court noted that the Comment would prohibit *ex parte* contact with

2. Any other person;

(a) Whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability; or

(b) Whose statement may constitute an admission on the part of the organization.

*Cole*, 903 F.Supp. at 977. The court concluded that limitation 2(b) "is an unmistakable reference to Evidence Rule 801(d)(2)(D)," which states that an admission by a party-opponent is, *inter alia*, "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship...." *Id.* After reviewing decisions of state and federal courts sitting in its district, the court concluded that none had properly synthesized Rule 4.2's Official Comment and *Fed.R.Evid.* 801(d)(2)(D). *Id.* This determination was of some moment, because the court noted that the "alter ego" test to identify current employees who could not be contacted *ex parte* used by the New York Court of Appeals in *Niesig v. Team I*, 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990), subsequently adopted by a number of other state and federal courts, and urged by MCC in this litigation, was based on a specific rejection of *Fed.R.Evid.* 801(d)(2)(D). *Id.* The *Niesig* court had rejected any interpolation of Evidence Rule 801(d)(2)(D) into its interpretation of the ethical standard, because the federal rule of evidence was different from the New York state rule. *Id.* (quoting *Niesig*, 558 N.E.2d

---

**12.** DR 7–104 has no comparable official comment, nor, indeed, any official comment at all; nor has the Iowa Supreme Court passed on the issue now before the court, although it has interpreted other aspects of the rule. However, to the extent that MRPC Rule 4.2 cases are persuasive on the interpretation of the nearly identical language of DR 7–104, the Official Comment to Rule 4.2 is also persuasive.

**13.** The court in *Carter–Herman* found that the other limitations on *ex parte* contacts identified in the Comment to Rule 4.2 were inapplicable in the case before it. *Carter–Herman*, 897 F.Supp. at 903. This court will consider those limitations, however, in this case.

·at 1035).[14] Therefore, the *Cole* court, relying on Evidence Rule 801(d)(2)(D) for a definition of employees who could make admissions, concluded that the prohibition on *ex parte* interviews extended to the following current employees:

> An agent or servant whose statement concerns a matter within the scope of the agency or employment, which statement was made during the existence of the relationship and which is offered against the organization as an admission. However, *ex parte* interviews of employees who are "mere witnesses" to an event for which the organization is sued (i.e., holders of factual information), are permitted.

*Cole*, 903 F.Supp. at 979; *and compare Branham*, 151 F.R.D. at 70 (adopting the "alter ego" test from *Niesig*, concluding that the fact that an employee's statement may be an admission under the provisions of *Fed. R.Evid.* 801(d)(2)(D), standing alone, "simply provides no basis for barring *ex parte* contact," because the rule in question is an ethical standard, not an evidentiary standard).

Another case in which limited *ex parte* access to current employees was permitted drew lines in several ways. In *Bouge v. Smith's Management Corp.*, 132 F.R.D. 560 (D.Utah 1990), the court rejected importation of the "admissions" limitation of *Fed.R.Evid.* 801(d)(2)(D) into MRPC Rule 4.2 via the comments on the ground that it was not a proper "ethical" rule, and would not foster the attorney-client interests the ethical rules were meant to protect. *Bouge*, 132 F.R.D. at 567. The court thus limited *ex parte* contact with higher level employees, but refused to preclude such contacts with "low level employees" even where an admission might be made which could be admissible against a corporation under *Fed.R.Evid.* 801(d)(2)(D). *Id.* Employing other criteria from *Niesig*, 558 N.E.2d at 1035, the court prohibited *ex parte* contacts with current employees who had the legal power to bind the corporation in the matter, were responsible for implementing the advice of corporate counsel, or whose interests were directly at stake in the representation. *Id.* at 570. These are pre-

cisely the only limitations MCC argues are appropriate in this case.

### 3. *Analysis here*

The court rejects any "automatic representation" rule, which would require a total ban on *ex parte* contacts with any current employees on the ground that all are automatically represented by the organizational party's counsel simply by virtue of their employment with the organization, because the courts to consider such a rule have invariably rejected it, *Carter–Herman*, 897 F.Supp. at 903; *Brown*, 148 F.R.D. at 251, and for good reason, as this court's discussion above demonstrates. By the same token, the court would reject a "no limits" rule on *ex parte* contacts, as without any support in case law. However, the court is not called upon to consider the validity of a "no limits" rule, because MCC has itself conceded that there should be some limits on its contact with current employees. MCC suggests that it be allowed to contact current employees with the exception of (1) corporate parties (by which the court believes MCC means officers and managerial employees) whose acts or omissions in the matter under inquiry are binding on the corporation; (2) parties who may impute liability to the corporation; or (3) employees who act at the instruction or advice of corporate counsel, citing *Niesig*, 558 N.E.2d at 1035. Defendant's Memorandum In Support Of Motion For Discovery Guidance, p. 2.

Terra argues for a complete prohibition on *ex parte* contacts with current employees in this case, except where it has agreed to such contacts, based on the applicability of Evidence Rule 801(d)(2)(D). Terra argues that the evidence rule allows even rank-and-file employees' statements to be deemed admissions of the employer. Plaintiff's Amended Response To Defendant's Motion For Guidance Relating To Discovery Matters, p. 7. Terra also asserts that *ex parte* contacts with any of the current employees it still seeks to shield are impermissible, "because they are individuals whose acts or omissions in the matter under inquiry are binding on the cor-

---

**14.** Iowa Rule of Evidence 801(d)(2)(D), however, is identical to *Fed.R.Evid.* 801(d)(2)(D).

poration and may impute liability to Terra," in light of MCC's asserted defense of inappropriate operations and maintenance of Terra's Port Neal plant as the cause of the explosion.[15] *Id.*

■ The court concludes that *ex parte* contacts should not be permitted with managerial level employees for two reasons. First, such persons plainly fall within the prohibitions on *ex parte* contacts under DR 7–104(A)(1) as that rule and the analogous rule of the MRPC have been uniformly interpreted by the courts. Second, MCC concedes such a limitation. This conclusion eliminates *ex parte* contact with the upper echelon of current employees, but eliminates only one of the current employees actually at issue here, Vernon Wing. The court finds that Mr. Wing's managerial capacity, as a supervisor in the shipping department overseeing as many as seven employees at a time, is sufficient that no *ex parte* contacts should be allowed with him.

Having looked at the "top" of the problem, the court turns next to consideration of the "bottom." The lowest echelon of current employees Terra seeks to protect from *ex parte* contacts here are those "rank-and-file" employees who could, although possessing no managerial capacity, nonetheless could make statements that are binding admissions under the most liberal constructions of *Fed. R.Evid.* 801(d)(2)(D).[16] However, the court finds that Terra has obviated any need for the court to consider to whom such an "admissions" limitation on *ex parte* contacts might apply by offering certain employees for *ex parte* contacts. The court finds it need not reach the "admissions" limitation as to the remaining employees, because other recognized limitations are more clearly dispositive.

■ The court finds the "imputation of liability" limitation dispositive of the remaining current employees at issue. The court notes that not every current employee who offers a statement from which its employer's liability for wrongful conduct could be imputed necessarily is an employee who can "impute liability" to his or her employer within the meaning of decisions interpreting the ethical rules. Some current employees may be only "fact witnesses" who hold factual information about what they observed *others* doing, *see Cole,* 903 F.Supp. at 979, and an imputation of liability to the employer may arise from what those employees say they

---

**15.** Terra has also suggested that *ex parte* contacts with its current employees who have settled claims against MCC is inappropriate, because of the potential for coercion of favorable statements from an implicit threat that the settlement could be withdrawn. The court simply perceives no danger of use of the settlements entered into in this case in such a coercive manner. The settlements have been entered into and are only awaiting approval. Withdrawing from a settlement agreement is by no means as easy a matter as Terra seems to argue it is. Although there might well have been some coercive effect of the *potential* for settlement, the court sees no such coercive effect when the settlement is essentially "a done deal."

**16.** This court notes with approval the resolution of the "admissions" problem in a case cited by Terra, albeit for a different proposition. In *McCallum v. CSX Transp., Inc.,* 149 F.R.D. 104 (M.D.N.C.1993), the court found that federal courts generally reject the *Niesig* test advocated by MCC here, "because New York had no state counterpart to *Fed.R.Evid.* 801(d)(2)(D) whereby a rank-and-file employee's statement could be deemed an admission of the employer [but] the situation is exactly to the contrary in federal court." *McCallum,* 149 F.R.D. at 109. The

McCallum court then adopted the procedure suggested in *Cagguila v. Wyeth Labs., Inc.,* 127 F.R.D. 653 (E.D.Pa.1989), which did not require the court to determine whether an ethical violation took place in a situation in which an admission was obtained during an *ex parte* contact, but would "simply disallow the use of any *Fed. R.Evid.* 801(d)(2)(D) admissions thereby obtained" during the litigation of the case. *McCallum,* 149 F.R.D. at 111–12 (citing *Cagguila,* 127 F.R.D. at 655. However, the *McCallum* and *Cagguila* courts specifically allowed the party that had made the *ex parte* contact to depose the person from whom any excluded admission was obtained and to use that person as a witness at trial. *Id.* The court finds that this limitation would serve the beneficial purpose of *ex parte* contacts, which is to obtain information quickly and inexpensively that will focus more formal inquiries into productive channels, while also guarding against the dangers the ethical rule was intended to prevent, which include overreaching to obtain admissions. *Cram,* 148 F.R.D. at 260–61; *see also McCallum,* 149 F.R.D. at 111. However, Terra has itself precluded the court from applying the *McCallum* approach in this case by offering for *ex parte* contact those employees who might otherwise have fallen into the "admissions" category.

observed, but it does not arise directly from the *actions* of those employees. In some cases, even where the employees are "actors," rather than "observers," the imputation of liability from those employees' acts may be too attenuated to bring them within the prohibition on *ex parte* contacts. For example, in *Curley v. Cumberland Farms, Inc.,* 134 F.R.D. 77 (D.N.J.1991), the court found that any imputation of liability from statements of employees obtained in *ex parte* contacts was "entirely hypothetical." *Curley,* 134 F.R.D. at 81. The court noted that many of the employees with whom *ex parte* contacts were sought would have "*no* relevant information concerning the dispute in this case," or "possess information which bolsters the [opposing party's] case." *Id.* More importantly, the court concluded that, in the RICO litigation before it, in order to establish liability of the employer, the opposing party would have to establish both the misconduct of the employees *and* that the defendants directed the extortionate activities. *Id.* Thus, even where the employees engaged in wrongful acts, the liability of their employer for those acts was not immediately established, but was instead still one step away from proof.

On the other side of this issue is *Lang,* 888 F.Supp. at 1149, a case in which the imputation of liability under Title VII for sexual harassment was held to be so direct as to preclude *ex parte* contact with any current employee. The court in *Lang* apparently rejected without comment plaintiff's argument that a statement from a co-worker which could lead to imputed liability does not impute liability itself, because the plaintiff would still have to establish that the employer knew or should have known about the co-worker's misconduct for liability to be imposed. *Id.*[17] As this court has indicated, it does not believe that the difference between statements of employees which could lead to imputed liability and the actual imputation of liability can be so easily dismissed. *Cf. Curley,* 134 F.R.D. at 81.

However, this case is different from *Curley,* and, for that matter, different from *Lang.* The twelve current employees at issue here are employees who could impute liability directly to Terra for their own wrongful *acts,* because it is their own conduct, not what they saw others do, that has the potential for being the central focus of MCC's defense of inappropriate operations and maintenance. Furthermore, Terra's liability, if any, for any wrongful acts of these employees could be directly imputed to Terra under a theory of *respondeat superior,* vicarious, or agency liability, in which Terra's liability depends only on whether wrongful acts of an employee were within the scope of the employee's employment. *See, e.g., Jones v. Baisch,* 40 F.3d 252 (8th Cir.1994) (under doctrine of *respondeat superior* under Nebraska law, a plaintiff must demonstrate that, at the time of an alleged tort, a "master and servant" relationship existed and the servant was acting within the scope of his or her employment); *Walsh v. United States,* 31 F.3d 696 (8th Cir.1994) (under Iowa law, *respondeat superior* liability of employer reaches acts of employee within the scope of the employee's employment); *see also Forrest City Mach. Works, Inc. v. United States,* 953 F.2d 1086 (8th Cir.1992) (recognizing that the extent of the "scope of employment" on which *respondeat superior* liability of employer for wrongful acts of its employee depends is a question controlled by applicable state law). Thus, the potential liability of the employer, Terra, for the possible wrongful acts of its employees, constituting inappropriate operations and maintenance of Terra's Port Neal plant, does not depend on a further showing that Terra directed those acts, *cf. Curley,* 134 F.R.D. at 81, or upon a further showing that it knew or should have known of those acts. *Cf. Lang,* 888 F.Supp. at 1149. The court finds that each of the twelve current employees at issue was at least potentially acting within the scope of his or her employment and it is the acts of these twelve employees that are, with reasonable likelihood, the targets of MCC's claims of

---

**17.** In *Carter–Herman,* 897 F.Supp. at 903, another Title VII case, also involving sexual harassment and retaliation, the court noted that no argument had been offered that liability could be imputed from any low-level employee, and instead authorized *ex parte* contacts limited only by a "managerial capacity" exclusion.

inappropriate operations or maintenance. As Terra aptly put the matter in oral arguments, if not these employees, then who? As the court's recital of the duties of these employees in its findings of fact demonstrates, each of these employees was directly responsible, to a greater or lesser extent, for the control, operation, testing, or maintenance of specific parts of the UAN unit or related units that are critical to a determination of the cause of the catastrophic explosion at the Port Neal plant on December 13, 1994.

The court notes further that the policy reasons for allowing *ex parte* contacts, such as significant economies in the discovery process, *Cram,* 148 F.R.D. at 261, aren't really present here. In several contexts, as in employment law cases, *ex parte* contacts may well mean the difference between filing and not filing a lawsuit. *Id.* However, here, it was plain from the magnitude of the catastrophe that legal actions involving or between these parties were almost inevitable. The court therefore errs on the side of caution, perhaps giving an overly expansive reading to which employees can impute liability by their actions to Terra. These twelve employees were, in all likelihood and fairness, ultimately going to have to be deposed anyway, even if for no other reasons than that they may be key "fact witnesses," *see Cole,* 903 F.Supp. at 979, so that significant savings that might be available from some kinds of *ex parte* contacts are unlikely to be realized here. The court therefore will deny MCC *ex parte* access to the twelve employees Terra seeks to shield from such contacts here.

### D.  *Guidelines For Ex Parte Contacts*

Even when courts have allowed *ex parte* contacts with current and former employees,

they have often imposed guidelines for the party conducting such contacts, either to identify the persons being contacted as within or without the group of employees with whom *ex parte* contacts are prohibited simply by reason of their status within the organization, or to protect the persons contacted from providing information without some notice of possible liability or other adverse collateral consequences that might arise from providing information.[18]  However, in this case, the *ex parte* contacts the court will authorize are only those to which Terra has already acceded. Terra placed no limitations on MCC's *ex parte* contacts with these employees apart from the condition, to which MCC agreed, not to contact the six current employees until after they had received checks in settlement of their claims against MCC, and the further agreement between the parties concerning contacts with Mr. Romig. This court therefore confirms those conditions, and having done so, finds that it need give the parties no further guidance on *ex parte* contacts.

## III.  CONCLUSION

The court concludes that it will not restrict at this time MCC's *ex parte* contacts with former Terra employees, with the exception of those former employees who have specifically agreed to be represented by Terra's counsel. In aid of this one limitation, the court directs that Terra shall provide MCC, within five days of the date of this order, a list of former employees with whom it has a specific agreement for representation.

The court will, however, restrict MCC's *ex parte* contacts with current employees of Terra with the exception of the six current employees Terra has agreed may be contact-

---

**18.**  For example, in *Carter–Herman,* even though the court recognized that the current employees who could be contacted *ex parte* were all police officers, and therefore "undoubtedly more sophisticated about the legal process than most laypersons," they should be protected by requiring counsel contacting them to advise them of (1) counsel's representative capacity; (2) counsel's reasons for seeking the interview; (3) the interviewee's right to refuse to be interviewed; and (4) the interviewee's right to have his or her own counsel present. *Carter–Herman,* 897 F.Supp. at 904. Other courts impose these and further guidelines or limitations for *ex parte* contacts

with current and former employees. *See In Re Prudential,* 911 F.Supp. at 155, (D.N.J.1995) (approving a "script" for initial contacts to determine who might be within the protected "control group"); *Florida Cities Water Co.,* 1995 WL 340980, *3 (requiring counsel for U.S. to advise persons contacted that they might be subject to prosecution under the Clean Water Act); *Cole,* 903 F.Supp. at 980 (adding to the four disclosures required in *Carter–Herman,* a fifth requirement that the contacting representative "not, under any circumstances, seek to obtain attorney-client or work product information from the employee").

ed *ex parte*, but only, as the parties agreed, after those six employees have received checks in settlement of their claims against MCC.[19] The court concludes that the remaining twelve current employees at issue in this discovery dispute are all ones who could potentially impute liability to Terra for inappropriate operations or maintenance of the Port Neal plant, thus potentially establishing MCC's principal defense to Terra's claims. Therefore, no *ex parte* contacts with those twelve current employees, nor with any other current employees of Terra, may be made by MCC in this case.

**IT IS SO ORDERED.**

**19.** In addition, the parties have agreed to the conditions under which now-former employee Mr. Romig may be contacted, and the court confirms those conditions here.