Gary OLSON, Plaintiff,

v.

SNAP PRODUCTS, INC. and Sam
McInnis, Defendants.

No. Civ. 97–2437RHK/RLE.

United States District Court,
D. Minnesota.

Oct. 19, 1998.

**540**

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Defendants' Motion to Disqualify Plaintiff's counsel, Thomas Dolven ("Dolven"). A Hearing on the Motion was conducted on July 23, 1998, at which time, the Plaintiff appeared by Dolven and Joel Rath, Esqs., and the Defendants appeared by David R. Kelly, Kirk G. Warner, and Christine N. Linblad, Esqs.

For reasons which follow, the Motion to Disqualify is denied.

### II. *Factual and Procedural Background*

This a products liability action for a personal injury which arose from a tire explosion involving the "fix a flat" tire inflator, which is manufactured by Defendant Snap Products, Inc. ("Snap"). The Defendants have moved to disqualify the Plaintiff's counsel, who has represented other clients in litigation involving accidents arising from the same alleged product defect, because of his *ex parte* contacts with former Snap employees, and with the Defendants' expert witnesses. Earlier this year, Dolven contacted Jeffrey Ketchledge ("Ketchledge"), Snap's former Vice-President of Operations, and Paul Norman ("Norman"), a former Snap executive who served, for a time of time, as its C.E.O. During the same period, he also approached both Montfort Johnsen ("Johnsen") and Reese Howle ("Howle"), both of whom, the Defendants claim, had been retained as their expert witnesses. All of these persons were asked for information which related to the subject matter of this case.

A. *Contacts with Expert Witnesses.* The first episode of claimed attorney misconduct occurred on January 2, 1998, when Dolven contacted Johnsen. Dolven explains that, in the course of litigating *Lyon v. Snap Prods.*, No. 96–D–2055 (D.Colo.), he learned that Johnsen was a design consultant who had helped develop the version of fix a flat that the Plaintiff claims to be defective. The *Lyon* case, like this one, involved the explosion of a tire that had been inflated with fix a flat. Dolven recalls that, in the *Lyon* case, Johnsen was listed as a fact witness, but also that the pertinent Rule 26(a)(1) disclosure mentioned that "Johnsen is expected to review the factual material available and to offer opinions regarding the cause of the accident." *Affidavit of Thomas R. Dolven* ¶ 10. The *Lyon* litigation was settled, and Snap disclosed no expert witnesses.

Dolven claims that he contacted Johnsen in order to ascertain his factual knowledge concerning the development of the product, and not to probe into any expert opinions that he may have formed. The January 2 telephone call, from Dolven to Johnsen, lasted 23 minutes. Dolven states that he informed Johnsen that he represented the Plaintiff in a lawsuit against Snap, which also involved fix a flat, and that he asked Johnsen whether any attorney had attempted to retain him as an expert in this case. Johnsen explained to him that he had never heard of this case, nor had he been retained by any attorney as an expert. Johnsen then asked Dolven whether he was looking to retain Johnsen as an expert, and Dolven responded that he was only seeking to learn Johnsen's factual knowledge about the product. *Dolven Aff.* ¶ 12. The two did discuss Johnsen's opinions about the scientific aspects of the product at issue, as well as the historical development of that product. *Deposition of Montfort A. Johnsen, Affidavit of Christine N. Linblad, Ex.* 1; *Dolven Aff.* ¶ 13–14. On January 28, 1998, Andrew Vanore ("Vanore"), who is an attorney representing Snap, contacted Johnsen and arranged for him to serve as an expert witness in this case, and in a similar matter that is being litigated in Arizona.

On March 5, 1998, Dan Hanrehan ("Hanrehan"), who is employed by Dolven as an investigator, arrived, unannounced, at Johnsen's home to interview him about the fix a flat. Soon afterwards, the Defendants' counsel told Dolven that Johnsen was their expert witness and that Dolven should have no further contact with Johnsen.

Dolven contacted another of the Defendant's experts, Howle, in order to ask him about the explosiveness testing that he had conducted for Snap, in 1994, on tires inflated with fix a flat. At some point prior to May 29, 1998, the Defendants' attorneys advised Howle that they wished him to testify in this case. *Second Affidavit of Reese Howle* ¶ 4. Dolven telephoned Howle on May 29, 1998, and the two had a brief conversation. Dolven explains that he was unaware that Howle had been retained as an expert by the Defendants, and there is no evidence that Dolven had been informed that the Defendants had intended to use Howle as an expert. According to Dolven, during the conversation, Howle advised that he had not heard of this litigation, and that he had not been requested by the Defendants' attorneys to investigate the matter, or to offer any expert opinions. After a short time, Howle became uncomfortable in answering Dolven's questions, and he told Dolven that his inquiries would need to be routed through Snap.

B. *Contacts with Former Employees.* On April 23, 1998, Dolven interviewed Ketchledge about issues concerning this case. Ketchledge had resigned from Snap in 1995, but was involved in the design of the allegedly defective tire inflator that has precipitated this lawsuit. The interview took place in the presence of Terence Kann ("Kann"), who is Ketchledge's personal lawyer. No legal representatives of Snap were present. Although the Defendants' attorneys were aware of the planned interview, and expressed their desire to be present at the meeting, Dolven and Kann state that they never objected to the *ex parte* interview of Ketchledge going forward. *Dolven Aff.* ¶ 4; *Affidavit of Terence J. Kann* ¶ 6. Warner, one of the Defendants' lawyers, remembers it differently. He claims that Snap's attorneys never acquiesced to Ketchledge's interview being conducted outside of their presence, and that they did, in fact, object to the interview proceeding. *Affidavit of Kirk G. Warner* ¶ 3. Dolven represents that the interview did not implicate Ketchledge's knowledge of any confidential communications between Ketchledge and Snap's attorneys. *Dolven Aff.* ¶ 5.

Finally, the Defendants protest Dolven's contacts with Norman, who is Snap's former C.E.O. Norman and Dolven have, on a number of occasions, discussed the evolution, design, and testing of the fix a flat tire inflator. Dolven explains that their discussions remained focused on Norman's knowledge of historical fact, and that they did not probe into the contents of any attorney-client communications. *Dolven Aff.* ¶ 6.

The Defendants consider Dolven's communications with these four individuals to violate both the Minnesota Rules of Professional Conduct, as well as the Federal Rules of Civil Procedure. They request that the Court: 1) disqualify Dolven from representing the Plaintiff in this action; 2) disqualify Dolven from participating in all future litigation involving the fix a flat; 3) disqualify any person who has been exposed to the information Dolven obtained from these contacts; 4) issue an injunction against Dolven, which would prohibit him from disclosing the "tainted" information to anyone else; and, 5) require Dolven to relinquish all notes or other recordings of his conversations with these individuals.

### III. *Discussion*

A. *Standard of Review.* A Federal District Court has the inherent authority and responsibility to regulate and supervise the bar practicing before it. *Jenkins v. Missouri,* 931 F.2d 470, 484 (8th Cir.1991), cert. denied, 502 U.S. 967, 112 S.Ct. 437, 116 L.Ed.2d 456 (1991), citing *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 605 (8th Cir. 1977), cert. denied, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978); *Cook v. City of Columbia Heights,* 945 F.Supp. 183, 185 (D.Minn.1996). While this inherent power "ought to be exercised with great caution," *Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824), the Court has wide discretion in framing sanctions to remedy abuses, including attorney disqualification, the assessment of attorney's fees, monetary sanctions, and the dismissal of an action. See, *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). That responsibility is carried out with the understanding that, "[b]ecause of the potential for abuse by opposing counsel, disqualifi-

cation motions should be subjected to particularly strict judicial scrutiny." *Harker v. C.I.R.*, 82 F.3d 806, 808 (8th Cir.1996).

■ Pursuant to Local Rule 83.6(d), the professional conduct of attorneys, who practice within this District, is governed by the Minnesota Rules of Professional Conduct. See, *Bieter Co. v. Blomquist*, 132 F.R.D. 220, 223 (D.Minn.1990). Our Court of Appeals has instructed us " 'to strictly enforce the Code of Professional Responsibility.' " *Jenkins v. Missouri*, supra at 486, quoting *Central Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988, 993 (8th Cir.1978). In exercising this responsibility, the Court should also consider "the ABA Code of Professional Responsibility, the court's duty to maintain public confidence in the legal profession and its duty to insure the integrity of the judicial proceeding." *United States v. Agosto*, 675 F.2d 965, 969 (8th Cir.1982), cert. denied, 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982). Ultimately, the party seeking the disqualification of opposing counsel bears the burden of showing that disqualification is warranted. See, *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1579 (Fed.Cir.1984), overruled on other grounds, *Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985); *Evans v. Artek Systems Corp.*, 715 F.2d 788, 794 (2nd Cir.1983); *Milliken v. Grigson*, 986 F.Supp. 426, 429 (S.D.Tex. 1997).

■ Although the moving party must satisfy a high standard of proof to sustain a disqualification motion, any legitimate doubts, which are created by the movant's proffer, must be resolved in favor of disqualification. See, *Coffelt v. Shell*, 577 F.2d 30, 32 (8th Cir.1978), quoting *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2nd Cir.1975).

B. *Legal Analysis.* Dolven's past conduct in contacting the Defendants' claimed experts, and former employees, violates no ethical Rule, or any obligation imposed by the Federal Rules of Civil Procedure. The Defendants' Motion, and their supportive arguments, certainly raise interesting ethics issues that are far from settled, but their evidentiary proffer falls well short of demonstrating that Dolven's communications with these individuals has threatened the integrity of these proceedings, or otherwise warrant his disqualification as the Plaintiff's counsel of Record.

1. *Dolven's Contacts with the Defendants' Experts.* No ethical rule expressly prohibits *ex parte* contact with an adversary's expert witnesses. See, *ABA Formal Op. 93–378* (1993). However, one of the Rules of Professional Conduct which the Court must "strictly enforce," see, *Jenkins v. Missouri*, supra at 486, is Rule 3.4(c), which provides that it is professional misconduct for an attorney to "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." *Rule 3.4(c), Minnesota Rules of Professional Conduct.* The Defendants charge that Dolven committed professional misconduct when he knowingly violated Rules 26(b)(4)(A) and (B), Federal Rules of Civil Procedure, by contacting their experts, Johnsen and Howle, outside of the formal discovery channels which those Rules provide.

■ These Rules allow a party to discover the opinions of testifying and consulting experts through the use of depositions or Interrogatories, subject to the limitations provided. See, *Rules 26(b)(4)(A) and (B), Federal Rules of Civil Procedure.* By implication, *ex parte* contacts with expert witnesses, in order to discover their opinions, are prohibited. See, *Erickson v. Newmar Corp.*, 87 F.3d 298, 301–02 (9th Cir.1996) (remanding for sanctions against attorney who contacted adversary's expert witness *ex parte* ).

■ The Plaintiff counters that this implicit prohibition should not apply to *ex parte* communications with an opposing party's experts, when those experts also played a role in the underlying transactions, or occurrences, which gave rise to the lawsuit, thereby rendering the expert, for such purposes, a fact witness. In this respect, he highlights the Advisory Committee Notes which address the 1970 Amendment of Rule 26, which added Section (b)(4) to provide, as follows:

This is a new provision dealing with discovery of information (including facts and opinions) obtained by a party from an ex-

pert retained by that party in relation to litigation or obtained by the expert and not yet transmitted to the party. \*\*\* It should be noted that the subdivision does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness.

Because Johnsen and Howle were both consulted with Snap in testing and developing their tire inflator product outside of the context of trial preparation, the Plaintiff argues that Rule 26(b)(4) does not prohibit Dolven's inquiry into their independent factual knowledge concerning the development of fix a flat.

There is a conceptual attractiveness to this argument. It is imaginable that a witness could possess two subsets of information— one involving matters of historic fact, and the other accumulated in preparation for trial— but it is not so easily imaginable that experts should be approached, on an *ex parte* basis, so that the former could be explored, reserving any inquiry on the latter to an occasion when opposing counsel were present. Such a practice would only invite controversy, overreaching, and professional misconduct. In practical terms, human perception and recall are not so neatly categorized. An expert's recollection of the factual development of product technology will inevitably be influenced by an overlay of subjectivity, inclusive of those factors which evolve into an expert opinion. We reject, as unsound, any attempt to artificially balkanize an expert's anticipated testimony into facts, and opinion, such as to allow informal, *ex parte* discovery of the facts, while prohibiting an *ex parte* inquiry into the expert's opinions. Quite simply, the dichotomy is unworkable.

Notwithstanding the errancy of the Plaintiff's legal argument, the Defendants have not persuaded us that Johnsen and Howle had actually been retained when contacts with Dolven occurred, or that Dolven should have been reasonably aware that these individuals were to be retained, by the Defendants, as experts. The Defendants have produced nothing to evidence that these individuals had been officially retained by them to serve as experts in this matter, nor have they produced any evidence to demonstrate that Dolven should have been aware of their claimed status as experts.

The Defendants' suggestion, that Snap's retention of Johnsen in the *Lyon* litigation, and their prior employment of Howle as a technical consultant, provides Snap with a perpetual lock on their knowledge and expertise is unpersuasive. First, while there is authority which would prevent experts from engaging in conflict situations, there is authority, which the Defendants have drawn to our attention, that disenfranchises certain experts from consulting with an opponent when a conflict is not presented—namely, when the expert testifies only as to historical facts. More importantly, to adopt the Defendants' position would inevitably chill a core function of judicial proceedings—the search for the truth—by permitting corporations to insulate factual witnesses from future discovery by indelibly branding the witness as an "expert." Thus, we have no reason to believe that Dolven should have known that these individuals had been retained as experts in this matter and, therefore, his contacts with them did not knowingly violate the rules of this tribunal.[1] See, *Rule 3.4(c)*, *Minnesota Rules of Professional Conduct.*

2. *Contacts with Former Snap Management Employees.* According to the Minnesota Rules of Professional Conduct, "a lawyer

---

1. We would reiterate our advices at the time of the Hearing on this Motion. An attorney who contacts a former expert of the opposing party, on an *ex parte* basis, engages in needlessly risky conduct. The better course is to allow discovery to have its proper play, particularly if the witness has previously given expert opinions, and that is a topic for the *ex parte* inquiry. Here, the evidence does not reveal any unprofessional overreaching on Dolven's part and, in fact, he has taken at least one of these experts deposition. Notwithstanding that fact, the Record is bereft of any evidence that, through the *ex parte* contact, Dolven was able to take unfair advantage of the expert during the course of the experts' deposition. While not determinative of the issue, we are not persuaded that Dolven intentionally sought to violate any Rule of Federal Civil Procedure, or any recognized precept of professional conduct.

shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so." *Rule 4.2, Minnesota Rules of Professional Conduct.* Where, as here, the client is an organization, the "Rule prohibits communications by a lawyer for one party concerning a matter in the representation **with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.**" *Rule 4.2, Minnesota Rules of Professional Conduct, Comment–1985* [emphasis added].

█ There is no dispute that Ketchledge and Norman, when employed by Snap, held positions in the organization that would place them under the Rule. The finite issue presented, then, is whether the Rule's scope extends to an organizational party's former managerial employees. It is a question that, as far as the Court is aware, has not been definitively settled in this jurisdiction. In 1991, the ABA Committee on Ethics and Professional Responsibility issued a formal opinion which directly addressed the issue. See, *Contact with Former Employee of Adverse Corporate Party, ABA Formal Op. 91–359* (1991), *Dolven Aff., Ex.* 4. The Committee believed that the concerns reflected in the comment to Rule 4.2 could survive the termination of the employment relationship, but it still opined that "a lawyer representing a client in a matter adverse to a corporate party that is represented by another lawyer may, without violating Model Rule 4.2, communicate about the subject of the representation with an unrepresented former employee of the corporate party without the consent of the corporation's lawyer." *Id.* at 3.

Of course, the Defendants are entirely correct in asserting that ABA Formal Opinion 91–359 is no more than what it purports to be—an opinion which does not control the Minnesota Supreme Court's interpretation of Rule 4.2, nor bind this Court's disposition of the matter before us. Nonetheless, the ABA's position is of clear guidance. Likewise, a majority of Courts which have considered the issue agree that, in general, Rule 4.2 does not bar *ex parte* attorney contacts with an adversary's former employees who are not themselves represented in the matter. See, e.g., *United States ex rel. O'Keefe v. McDonnell Douglas Corp.,* 961 F.Supp. 1288, 1295 (E.D.Mo.1997), aff'd, 132 F.3d 1252 (8th Cir. 1998); *Jenkins v. Wal–Mart Stores, Inc.,* 956 F.Supp. 695, 697 (W.D.La.1997); *Orlowski v. Dominick's Finer Foods, Inc.,* 937 F.Supp. 723, 728 (N.D.Ill.1996); *Concerned Parents of Jordan Park v. Housing . Auth. of St. Petersburg,* 934 F.Supp. 406, 408 (M.D.Fla. 1996); *Terra Int'l, Inc. v. Mississippi Chem. Corp.,* 913 F.Supp. 1306, 1315 (N.D.Iowa 1996); *Aiken v. Business and Industry Health Group, Inc.,* 885 F.Supp. 1474, 1476 (D.Kan.1995); see also, generally, Benjamin J. Vernia, *Right of Attorney to Conduct Ex Parte Interviews with Former Corporate Employees,* 57 A.L.R.5th 633 (1998). A minority of Courts, which are concerned over the unfairness of litigants being able to obtain the sensitive information of an opponent from the opponent's past employees, extend the "no contact" rule to former employees. See, e.g., *Camden v. Maryland,* 910 F.Supp. 1115, 1121 (D.Md.1996) (" 'What seems certain is that adversary counsel and the former employee himself (particularly given that he may harbor hostility against his former employer) cannot be left to judge.' "); see also, *Michaels v. Woodland,* 988 F.Supp. 468, 472 (D.N.J.1997) (applying Rule to former employees who were in litigation control group)

Some Courts, however, have recognized circumstances in which the concerns reflected in the comment to Rule 4.2 survive the termination of the employment relationship, and these Courts employ a flexible approach when applying the Rule to former employees, "calling for an assessment of the likelihood that the contact in question has actually impaired the policy underlying Rule 4.2, of protecting privileged information from being disclosed to an opponent in litigation." *Spencer v. Steinman,* 179 F.R.D. 484, 491 (E.D.Pa.1998); see also, *Orlowski v. Dominick's Finer Foods, Inc.,* supra at 728 (although Rule 4.2 does not apply to former

employees, former employees would be barred from divulging any privileged information).

 In our view, this latter, flexible approach stakes out a sensible and policy-oriented middle ground worthy of adherence. While matters of this sort may warrant "bright-line" rules, seldom do such categorical pronouncements survive variant factual applications. This pliant rule gives recognition to the underlying policy of Rules 4.3 and 4.4 of the Minnesota Rules of Professional Conduct, by prohibiting an attorney from unfairly taking advantage of unrepresented parties when acting on behalf of a client, while still allowing leeway for the proper search for the truth. Therefore, the pivotal question, in evaluating the propriety of Dolven's contacts with Snap's former employees, is the likelihood that any information gathered by Dolven actually intruded upon any legally privileged matters.

Dolven represents that, consistent with Rule 4.3 he informed Ketchledge and Norman of his representation of the Plaintiff in this matter, and that he did not ask either of them to discuss matters that would be privileged, and there is no evidence that privileged matters were disclosed, or discussed. Accordingly, we cannot say that either contact violated Rule 4.2.

While we can accept Dolven's representations as an officer of the Court, and here find no ethical violation, the Defendants properly note that reasonable minds could differ as to the scope of any privilege and, as between an unrepresented layperson and an opposing counsel, they have substantial concern that, in any future informal interviews, their legal privileges may not be properly protected. We agree, and our holding, therefore, should be read as reflecting no more than our refusal to order Dolven's disqualification on the basis of what has transpired to date. As a prospective matter, we emphasize that an attorney's discussions with former members of an organizational party-opponent's management could intrude upon privileged matters, which would not be permissible under Rule 4.2. When viewed in the context of the potential sanctions for such an intrusion, we think caution suggests deliberate avoidance of even the appearance of unprofessionalism, particularly when the result could be the deprivation of the client's access to legal representation of his or her own choice. We need not say more.

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendant's Motion to Disqualify Counsel [Docket No. 30] is DENIED.

2. That the Plaintiff's Motion for an Enlargement of Time to Respond to the Defendant's Motion to Disqualify [Docket No. 43] is GRANTED.