in the first amended complaint, I will deny the motion to compel.

Accordingly,

**IT IS HEREBY ORDERED** that the motion to dismiss filed by defendant Jiangsu Sopo Corporation (Group) Ltd. [# 98] is granted.

**IT IS FURTHER ORDERED** that BP Chemical's motions to amend [# 113] and to compel jurisdictional discovery [# 121] are denied.

A separate Order of Dismissal as to defendants Jiangsu Sopo Corporation (Group) Ltd. and Zhenjiang Chemical Plant is entered this same date. The hearing for entry of default judgment as to defendant Shanghai Petrochemical Engineering Co. remains set for June 28, 2001.

**MIDWEST MOTOR SPORTS, INC.,**
a South Dakota corporation, d/b/a
**Elliott Power Sports, Plaintiff,**

v.

**ARCTIC CAT SALES, INC., a**
**Minnesota corporation,**
**Defendant.**

No. CIV 99–4117.

United States District Court,
D. South Dakota,
Southern Division.

April 23, 2001.

Steven M. Johnson, Ronald A. Parsons, Jr., Johnson, Heidepriem, Miner & Marlow, Sioux Falls, SD, for Plaintiff.

Roger W. Damgaard, James E. Moore, Timothy R. Shattuck, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for Defendant.

Daniel W. Lias, Sioux Falls, SD, for Interested Party A–Tech Cycle Service.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

During the course of this litigation the Court awarded sanctions against the Defendant because of the actions of defense counsel. The sanctions were the exclusion from evidence at trial the recordings made by Defendant's private investigator and any evidence obtained as a result of those recordings. The case was subsequently settled although the parties and the Court reserved the question of whether additional sanctions should be imposed. In view of the unsettled state of the law applicable to some of these issues, the Court is not going to impose any separate sanctions against counsel for Defendant. The Court is, however, going to explain more fully the basis for the sanctions that were awarded with that explanation also being guidance for other lawyers that practice before the Court.

The Court granted the motions for sanctions filed by Plaintiff Midwest Motor Sports, Inc. (Elliott) and A–Tech Cycle Service, Inc., against Defendant Arctic Cat and its counsel for hiring a private investigator to pose as a consumer, along with his wife or daughter, in visits to Elliott and A–Tech Cycle, Arctic Cat's Sioux Falls franchisees, for the purpose of making secret audiotape recordings of conversations in anticipation of trial.[1]

1. Although A–Tech Cycle Service, Inc. is not a party or intervenor in this case, Arctic Cat's counsel also directed the investigator to visit and record at A–Tech. Jon Becker, who is the owner and principal of A–Tech, apparently by chance, was the person interviewed and recorded. Mr. Becker was a critical nonparty witness in the case. A–Tech subsequently filed a lawsuit against Arctic Cat on June 5, 2000, Civil 00–4107 (S.D.S.D.). That case was settled after the settlement in this case.

## I. Background

The parties are represented by well qualified lawyers, and for that reason, it distresses the Court to impose sanctions on defense counsel because they failed to comply with the South Dakota Rules of Professional Conduct. Nevertheless, the Court possesses an inherent power, which it must exercise with restraint and discretion, to discipline attorneys who appear before the Court. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–46, 111 S.Ct. 2123, 2131–34, 115 L.Ed.2d 27 (1991); *Greiner v. City of Champlin,* 152 F.3d 787, 790 (8th Cir.1998). As was stated in the Court's previous memorandum opinion, the sanctions in this case are not pursuant to either Rule 11 or Rule 37 or Rule 26. The Court accepts its responsibility to impose necessary discipline on lawyers in order to assure preservation of the judicial process.

The Court also recognizes that counsel on both sides of this dispute have provided spirited representation of their clients, as they should. Spirited representation, however, should not give rise to the acrimonious relationships between counsel that existed in this case. The Court's focus in this opinion is the conduct of South Dakota counsel of record for Arctic Cat. No lawyer who appears before the Court should forget that "[t]he duty of an attorney to his client demands nothing more than an honest effort to secure justice for such client; it does not permit, neither does it excuse, a resort to deception to procure for a client even that to which the attorney honestly believes his client is entitled." *In re Wilmarth,* 42 S.D. 76, 172 N.W. 921 (S.D.1919).

On November 5, 1999, both Arctic Cat lawyers, Roger W. Damgaard and Timothy L. Shattuck, met with a private investigator, a former Special Agent with the FBI, in Mr. Shattuck's office. The Court has before it the depositions of the investigator and his wife taken on February 25, 2000, (Doc. 141, Exs. E & M), the notes the investigator made during his November 5 meeting with the two Arctic Cat lawyers (*Id.,* Ex. G), as well as the investigator's billing statements and the partner's correspondence to Arctic Cat seeking payment for the investigator's fees and expenses. (*Id.* at Ex. F.)

The investigator testified that his notes reflect the "general background of things they wanted me to look at," and that he understood his assignment to include audiotaping of conversations. (Ex. E, Investigator's Dep. at 9.) The investigator testified that the meeting opened with both attorneys telling him that Plaintiff's counsel was "breaking the rules." Although he did not quite understand what rules were being broken, the investigator said he learned "there was some sort of conflict between attorneys, there were four or five attorneys mentioned," some of whom were mentioned in his notes, including Dan Lias, counsel for A–Tech, and Chad Swenson, an associate lawyer in the firm of Plaintiff's counsel, Steve Johnson. He thought the conflict had something to do with the Johnson law firm representing both Elliott and A–Tech. Additional notes establish that the lawyers gave the investigator details about their perception of the conflict. (*Id.* at 10–14.)

The investigator testified that the lawyers asked him to visit the Elliott show room, see what was there, and talk to a salesman to "see what the salesman represented in the way of the product that they were promoting, what kind of equipment they had, that sort of stuff." He testified further, "[t]hey wanted me to go out to the dealership and find out which snowmobiles they were recommending and why, look at the equipment that was there." He thought the reason he was supposed to visit Elliott was "to determine what was selling best, whether they were hurt be-

cause Arctic Cat wasn't being sold there any longer." (*Id.* at 14, 15.) He told the attorneys he could wear a recording device in his inside jacket pocket to record the conversations. (*Id.* at 15, 23.) The investigator knew that Elliott Power Sports was represented by counsel and that there was a pending lawsuit. (*Id.* at 15.) The investigator testified that the attorneys "did not give me a script, they indicated from my notes various things here, thought you sold Arctic Cat, and which are the best snowmobiles." (*Id.* at 16.) Plaintiff's counsel asked, "In other words, these are things that they wanted you to say to the sales people to see what the sales people would say back to you and you would record that?" and the investigator answered, "Yes, sir, and as you heard the tapes, you heard a lot of information provided to me about individual snowmobiles and the product that they were selling." (*Id.* at 16.) The investigator wrote in his notes: "*ADMIT* SKIDOO & OR YAMAHA BEST." (Doc. 141, Ex. G at 2.) When the investigator visited Elliott, he did not tell anyone what his true mission was, and he did not tell anyone that he was wearing a device to record the conversation. (Investigator's Dep. at 17.)

The investigator testified that his notes contained the phrase, " *bad mouth ATech,* " which meant he was to see if Elliott would make negative comments about A–Tech. It turned out that the Elliott salesman did not do so. (*Id.* at 18.) The attorneys also instructed the investigator to get into financing, promotions, and close-out pricing on 1999 snowmobiles. The investigator was directed to "have the sales person relate to me, you know, the situation on all the snowmobiles, and why he doesn't have Arctic Cat any more and that type of stuff, if I could get that out of him." (*Id.* at 19.)

The investigator's notes contained the name "Jim LeTendre." When counsel asked, "were you supposed to try to talk to him?" the investigator responded, "No. They indicated that he was the sales manager, I may or may not see him when I was there." (*Id.*) When counsel asked, "Then you were supposed to ask him if you bought Arctic Cat could you get it serviced elsewhere?" the investigator answered, "Yes, or there." (*Id.*)

Before visiting the Elliott showroom, on November 8, 1999, the investigator traveled to the Dakota Plains Polaris dealership in Tea, South Dakota, and on November 9, 1999, he went to Interlakes Sports in Madison, South Dakota, where he posed as a customer to learn more about snowmobiles. He did not tape record those conversations. Interlakes is an Arctic Cat franchisee and carries three other snowmobile lines. (*Id.* at 19–20, 22.)

On November 11, 1999, the investigator billed for his first investigation at A–Tech Cycle Service. His mission was to "[b]ecome familiar with the Arctic Cat line of snowmobiles." (*Id.* at 22, 24.) The investigator knew that A–Tech and Jon Becker were represented by attorney Dan Lias. When asked by counsel, "Do you have an understanding of why you were recording at A–Tech?" the investigator responded, "I assumed that if the sales person there would say anything about the lawsuit, other than memorializing the information on the product that they were selling, too." The investigator's wife went along for "companionship and cover." (*Id.* at 24, 27.) When they walked in the shop, Becker introduced himself to them immediately, but they nonetheless continued with their ruse. A–Tech carries only the Arctic Cat snowmobile line, and Becker said nothing negative about Elliott. The investigator testified Becker was very busy that day, but he stayed with them and they learned a lot about snowmobiles. (*Id.* at 24–25.)

The investigator and his wife posed as customers when they visited the Elliott showroom for the first time on November 12, 1999. (*Id.* at 26–27.) The transcript of the tape recording the investigator made of this conversation establishes that the investigator and his wife engaged the salesman, Bill, in conversation about the Arctic Cat product in an attempt to elicit admissions about whether Elliott could still sell a 1999 Arctic Cat snowmobile, why Elliott no longer carried Arctic Cat snowmobiles, and the extent to which Elliott could obtain parts for and service Arctic Cat snowmobiles. They also asked questions designed to allow Bill to extol the qualities of competitors' snowmobiles. They engaged Bill in discussion about A-Tech Cycle Service, and during that discussion, the investigator's wife pointedly stated to Bill: "So you wouldn't have chosen to go off Arctic Cat." Bill's response to her remark was favorable to Elliott's position in this lawsuit. (Doc. 149, Ex. B at 32.)

The investigator met with Mr. Damgaard and Mr. Shattuck at the law firm on November 15 and produced his tape recordings and the brochures he received during his showroom visits. (*Id.* at 26.) The investigator met with Mr. Damgaard again on December 24, 1999, and discussed a return visit to Elliott to see if Elliott received another shipment of snowmobiles and "what the status was at that time." (*Id.* at 28.) The investigator and his daughter attempted the second visit to Elliott on December 27, but the store was closed. They went back the next day, December 28, and he taped another conversation with Bill. During that conversation, Bill stated: "The reason we didn't have Ski-doo in the beginning was because we had Arctic Cat. And now we don't have Cat. We chose Ski-doo over Cat." (*Id.*, Ex. C at 4.) There is no indication that Bill at Elliott Power Sports or Jon Becker at A-Tech had any suspicion that the investigator and his wife and daughter were not actual customers.

The investigator consulted with Mr. Damgaard again on January 6, 2000, and provided him with the tape of the second visit to Elliott. (*Id.* at 28–30.) The investigator received copies of letters Mr. Damgaard sent to Arctic Cat attorney Paul Ihle in Thief River Falls, Minnesota, seeking payment for the investigator's services, but the investigator never spoke to Ihle. Arctic Cat paid the investigator's bills. (*Id.* at 31, Ex. F.)

At the close of the investigator's deposition, Plaintiff's counsel asked: "Obviously the purpose of these trips wasn't to be a consumer shopping for a snowmobile, it was to attempt to elicit evidence in a pending civil case on behalf of the lawyers that hired you, correct?" and the investigator answered, "Yes, sir." The investigator testified that, as an FBI Agent investigating criminal cases for thirty years, he would not have attempted to talk to a person or elicit evidence from a person in a criminal case if he knew that person was represented by counsel. The investigator testified that his tape recording in this case did not concern him because he is "unfamiliar with civil procedures" and he "assumed that it was one party monitoring." The investigator testified he asked Mr. Damgaard and Mr. Shattuck before he made the visits "if what I am going to be doing is legal," and they told him, "Yes." Mr. Damgaard and Mr. Shattuck did not visit with him about any rules of professional conduct concerning communications with a person represented by counsel. (*Id.* at 34–35.) On November 24, 1999, after the investigator had surreptitiously visited Elliott and A-Tech and then met with Mr. Damgaard and Mr. Shattuck to turn over his audiotapes, Mr. Shattuck sent a Rule 34 Request for Inspection to Plaintiff's counsel, Steve Johnson, seeking

to inspect, photograph, and videotape Plaintiff's store. (Doc. 141, Ex. J.) Mr. Shattuck later sent a similar Request for Inspection to A–Tech. (*Id.*, Ex. K.)

Attorney Paul Ihle, who maintains a law practice in Thief River Falls, Minnesota, has provided legal services to Arctic Cat since its inception in 1981 or 1982. (Ihle Dep. at 7.) He testified that he had very little involvement in developing the strategy of this case, and that the two South Dakota attorneys contacted him or Arctic Cat personnel directly if the attorneys had questions, comments, or needs. (*Id.* at 21–22.) Ihle further testified that he was not involved in the planning to hire the investigator for the purpose of visiting and audiotaping personnel at Elliott and A–Tech. He could not recall when he first heard about it. He received the investigator's billing statements from the South Dakota lawyers and forwarded them to Arctic Cat for payment, but it was not his responsibility to approve those payments. (*Id.* at 22–23.) There has been no improper conduct shown by either Mr. Eihle or Arctic Cat Sales, Inc.

Mr. Damgaard is a partner and Mr. Shattuck is an associate in the same law firm. It has not been suggested that there is a basis for Rule 5.2(b) protecting the associate from sanctions in this case. Rule 5.3, which governs a lawyer's direction of non-lawyers, does also place additional burdens upon partners. However 5.3(b) makes no distinction between partners and associates as it simply provides that in the case of a nonlawyer retained by a lawyer, "(b) a lawyer having direct supervisory responsibility over the nonlawyer shall make reasonable effort to ensure that the person's conduct is compatible with the professional obligations of the lawyer". The record does not show any difference in supervisory authority between the two lawyers over the investigator, but it is reasonable to assume that the direct au-thority over the investigator was exercised by the partner.

## II. Legal Analysis

Supreme Court Justice Stevens, joined by Justices Brennan and Marshall in a dissenting opinion filed in a criminal case, stated:

> In civil litigation it is improper for a lawyer to communicate with his or her adversary's client without either notice to opposing counsel or the permission of the court. [citing in footnote Disciplinary Rule 7–104 of the ABA Model Code of Professional Responsibility (1982) and Rule 4.2 of the ABA Model Rules of Professional Conduct (1984)] An attempt to obtain evidence for use at trial by going behind the back of one's adversary would be not only a serious breach of professional ethics but also a manifestly unfair form of trial practice.

*Patterson v. Illinois,* 487 U.S. 285, 301, 108 S.Ct. 2389, 2399, 101 L.Ed.2d 261 (1988) (Stevens, J., dissenting). Such an attempt to obtain evidence for use at trial by going behind the back of one's adversary is precisely what occurred here, and the Court concludes this attempt is a breach of professional ethics and an unfair form of trial practice.

Members of the State Bar of South Dakota are governed by the South Dakota Rules of Professional Conduct (SDRPC), also known as the Model Rules of Professional Conduct. SDCL ch. 16–18 App.; *In the Matter of the Discipline of Dorothy,* 2000 SD 23, ¶ 20, 605 N.W.2d 493, 498 (S.D.2000). "A willful violation of any of the duties of an attorney prescribed in the SDRPC provides grounds for discipline." SDCL § 16–19–33(3); *In the Matter of the Discipline of Mines,* 523 N.W.2d 424, 426 (S.D.1994).

Plaintiff contends that the conduct of Arctic Cat's counsel in employing an investigator to "manufacture evidence" and to

seek admissions against plaintiff's interest for use at trial violated three of the South Dakota Rules of Professional Conduct: Rule 4.2, Rule 5.3, and Rule 8.4. Rule 4.2 states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

There are at least four purposes for Rule 4.2. That rule "(1) prevents unprincipled attorneys from circumventing opposing counsel to obtain careless statements from adverse parties, (2) protects the integrity of the attorney-client relationship, (3) prevents the inadvertent disclosure of privileged information, and (4) facilitates settlement by channeling disputes through lawyers familiar with the negotiation process." *Guillen v. City of Chicago,* 956 F.Supp. 1416, 1427 (N.D.Ill. 1997). *See also Terra Int'l, Inc. v. Mississippi Chemical Corp.,* 913 F.Supp. 1306, 1314 (N.D.Iowa 1996); *Faison v. Thornton,* 863 F.Supp. 1204, 1213 (D.Nev.1993); *Miano v. AC & R Advertising, Inc.,* 148 F.R.D. 68, 75 (S.D.N.Y.1993). Many of the court opinions discussing which employees of an opposing organizational party an attorney may contact focus on the Comment to Rule 4.2. *See Terra Int'l, Inc.,* 913 F.Supp. at 1313. The Court is not here concerned with the voluminous number of cases addressing whether former employees of an organization may be contacted, because the investigator here contacted one current employee of Elliott Power Sports and Jon Becker, current owner of A–Tech.

Plaintiff asserts that it warned the lawyers for Arctic Cat not to contact Elliott representatives before the investigator made his visits. In providing the names of persons with knowledge in Plaintiff's Answer to Defendant's Interrogatories (First Set), Plaintiff listed Elliott Power Sports and then stated: "(The Defendant is admonished not to attempt to contact representatives of the Plaintiff.") (Doc. 141, Ex. A.) On August 19, 1999, Plaintiff's counsel, Steve Johnson, wrote a letter to Arctic Cat's counsel, Tim Shattuck, objecting to Arctic Cat sending letters to Don Elliott, owner of Elliott Power Sports. (*Id.,* Ex. B.) The investigator did not meet with or tape record Don Elliott nor has it been shown that any other individual who the investigator met or taped was in a managerial capacity at Elliott Power Sports. Thus, the Court must consider whether Plaintiff was correct to admonish Arctic Cat not to attempt to contact "representatives" of Elliott Power Sports, and whether the investigator's two contacts with the Elliott Power Sports sales person, Bill, ran afoul of Rule 4.2.

Courts have rejected arguments that all employees of an organization are represented parties within the meaning of Rule 4.2 simply by virtue of their employment with the represented organization without any initiative on the part of the employee to obtain legal help from the organization. *See e.g., Terra Int'l, Inc.,* 913 F.Supp. at 1317; *Carter–Herman v. City of Philadelphia,* 897 F.Supp. 899, 903 (E.D.Pa.1995); *Brown v. St. Joseph Co.,* 148 F.R.D. 246, 251 (N.D.Ind.1993). They reason that such "automatic representation" would not serve a useful purpose, but instead would impede investigation leading to or following the initiation of a lawsuit. *See e.g., Terra Int'l, Inc.,* 913 F.Supp. at 1317. Moreover, courts theorize that such a rule would place too much power in the employer to control *ex parte* contacts with opposing counsel in order to stifle criticism or to prevent the revelation of negative information. *Id.* Without a showing that Plaintiff's counsel represents all Elliott employees, the Court concludes that El-

liott could not suggest to opposing counsel that it had such "automatic representation" of all Elliott employees.

▮ Nonetheless, a current employee of an organization may be off limits for *ex parte* contact by the opposing party's counsel or counsel's agent even if the employee has not entered into a formal agreement for representation with the organization's counsel. "[C]ourts, commentators and bar associations have struggled to fashion an anti-contact rule which strikes an appropriate balance between the interests of the corporation and the need of adverse parties to conduct inexpensive informal discovery." *Brown*, 148 F.R.D. at 253. These efforts have produced numerous tests, including the "blanket" test, barring all *ex parte* contact with current and former corporate employees; the "scope of employment" test, which prohibits contact with corporate employees about matters within the scope of their employment; the "managing-speaking-agent" test, which allows *ex parte* contact with corporate employees except for those who have legal authority ("speaking authority") to bind the corporation in a legal evidentiary sense; the "balancing" test, which is applied case-by-case to determine the degree to which *ex parte* communication is necessary to reveal relevant information, the danger of generating admissions against the corporation that are admissible at trial under Federal Rule of Evidence 801(d)(2)(D), and the degree to which the effective representation of counsel requires corporate counsel to be present at employee interviews; and the "control group" test, which allows *ex parte* contact with all current corporate employees except the most senior management officials in the corporation's "control group." *See id.* at 253–54 (and numerous cases cited therein). Courts do not tend to authorize unrestricted *ex parte* contact with current employees of an organization or corporation. *See Terra Int'l, Inc.*, 913 F.Supp. at 1318.

In *Brown*, 148 F.R.D. at 254, the district court adopted what it called "the test embodied in the official Comment to Rule 4.2," which equates an organizational or corporate party with:

(1) persons having a managerial responsibility on behalf of the organization; (2) persons whose acts or omissions in connection with the matter may be imputed to the organization for purposes of civil or criminal liability; or (3) any person whose statement may constitute an admission on the part of the organization.

*See also Belote v. Maritrans Operating Partners, L.P.*, 1998 WL 136523, at * 2 (E.D.Pa.1998) ("[T]his district, in the absence of guidance from the Third Circuit or the Pennsylvania Supreme Court, has opted to employ the tests laid out in the plain language of Rule 4.2 and its comment."); ABA Comm. On Ethics and Professional Responsibility, Formal Op. 95–396 (1995). The *Brown* court said the last category is a reference to Federal Rule of Evidence 801(d)(2)(D), which establishes that a statement is not inadmissible hearsay if it is offered against a party and is " 'the statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]' " *Id.; Belote*, 1998 WL 136523 at *3–4. One commentator has said that the inclusion of the second and third categories in the Comment to Rule 4.2 "gives a sound practical cast to the rule:"

those who can hurt or bind the organization with respect to the matter at hand are off limits except for formal discovery or except with the consent of the entity's lawyer. A typical example would be a truck driver whose involvement in an accident led to a lawsuit against his employer. The truck driver is plainly not in the control group, yet the company and the company's lawyer have a strong interest in monitoring what he says to

their opponent, because their opponent can use what he says free of the hearsay rule.

2 G. Hazard & W. Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct § 4.2:105 at p. 734 (2d ed.1990) (quoted in *Brown,* 148 F.R.D. at 254.)

The district court in *Cole v. Appalachian Power Co.,* 903 F.Supp. 975, 977–79 (S.D.W.Va.1995), was also concerned about corporate employees making damaging statements which later, at trial, constitute admissions against employers under Rule of Evidence 801(d)(2)(D). Some courts have rejected interpolation of Rule 801(d)(2)(D) into the ethical standard of Rule 4.2 because their state evidentiary rule is not identical to Rule 801(d)(2)(D), *see e.g., Niesig v. Team I,* 76 N.Y.2d 363, 559 N.Y.S.2d 493, 558 N.E.2d 1030 (1990), or because the evidentiary rule is not an ethical rule and would not foster the attorney-client interests the ethical rules are designed to protect. *See e.g., Bouge v. Smith's Mgt. Corp.,* 132 F.R.D. 560, 567 (D.Utah 1990).

South Dakota's hearsay rule, however, while not identical, is substantially equivalent to the federal rule. SDCL § 19–16–3(4). And this Court, like others, is concerned about attorneys circumventing the formal discovery rules through surreptitious means to produce evidence that will be admissible at trial as admissions against interest of the corporate party. Such "going behind the back of one's adversary" results in manifestly unfair trial practice that was meant to be avoided by adoption of the Federal Rules of Civil Procedure. In this case, Mr. Shattuck purported to follow the Federal Rules in requesting permission of Plaintiff's counsel to inspect and videotape Elliott Power Sports, but only after he and Mr. Damgaard had already secretly utilized the investigator to attempt to elicit damaging statements

from Elliott employees. No particular employee was targeted, but "Bill" happened to be the one who was recorded. At trial, for example, Arctic Cat undoubtedly would have offered as admissible under Rule 801(d)(2)(D) Bill's statement to the effect that it was a business decision to drop Arctic Cat.

■■■ However, like the district court in *Terra Int'l, Inc.,* the Court rejects a total ban on *ex parte* contacts with current employees of an organization or corporation, and the Court rejects as well unrestricted *ex parte* contacts with current employees of an organization or corporation. *Terra Int'l, Inc.,* 913 F.Supp. at 1320. Any current corporate or organization employee who is represented by counsel may not be contacted *ex parte* by opposing counsel. *Hill v. St. Louis Univ.,* 123 F.3d 1114, 1117 (8th Cir.1997). Additionally, the Court adopts the *Cole* holding, 903 F.Supp. at 979, that counsel or counsel's agent may not conduct *ex parte* interviews with five classes of an adversary corporation's or organization's current employees under Rule 4.2, unless counsel has the consent of the opposing attorney or is otherwise authorized by law to make such *ex parte* contact:

1. Current officials of the corporation or organization who have managerial responsibility;

2. Other current corporate or organizational employees whose act or omission in connection with the matter may be imputed to the corporation or organization for purposes of civil or criminal liability;

3. Those who are responsible for implementing the advice of the corporation's or organization's lawyers;

4. Any members of the corporation or organization whose own interests are directly at stake in a representation; and

5. An agent or servant of the corporation or organization whose statement

concerns a matter within the scope of the agency or employment, which statement was made during the existence of the relationship and which is offered against the corporation or organization as an admission. However, *ex parte* interviews of employees who are "mere witnesses" to an event for which the corporation or organization is sued (i.e., holders of factual information), are permitted. Depending upon the information sought, *ex parte* questioning could be done under the fifth category.

█ When an attorney or an investigator or other agent for the attorney attempts to conduct an *ex parte* interview with a current employee of an adversary organization or corporation, Rule 4.3 of the South Dakota Rules of Professional Conduct controls. Ethical considerations are as applicable to representatives of lawyers as to lawyers themselves. *See Upjohn Co. v. Aetna Cas. & Sur. Co.*, No. 4:88 CV 124, 1990 WL 446503, at * 1 (W.D.Mich. July 13, 1990). Rule 4.3 reads:

In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding.

The attorney or investigator shall: (1) fully disclose his or her representative capacity to the employee, (2) state the reason for seeking the interview as it concerns the attorney's client and the employer, and (3) inform the individual of his or her right to refuse to be interviewed. The attorney or investigator shall not, under any circumstances, seek to obtain attorney-client or work product information from the employee. *See Cole*, 903 F.Supp. at 980.

█ Rules 5.3 and 8.4 of the South Dakota Rules of Professional Conduct prohibit a lawyer from violating or attempting to violate the rules of professional conduct through the acts of another. *See Holdren*, 13 F.Supp.2d at 1194. Because the lawyer may not contact a current employee of an organization or corporation who falls within one of the categories listed above, the attorney may not avoid the rule by directing an investigator or anyone else to contact those employees. *Id.* (quoting ABA Comm. On Ethics and Professional Responsibility, Formal Op. 95–396 (1995) (" 'Since a lawyer is barred under Rule 4.2 from communicating with a represented party about the subject matter of the representation, she [under Rule 8.4(a) ] may not circumvent the Rule by sending an investigator to do on her behalf that which she is herself forbidden to do.' ")).

Defense counsel cite numerous cases in arguing that their conduct did not violate the Rules of Professional Conduct. Some of those cases were decided under state law that only prevents contact between counsel and members of a "litigation control group." *See Apple Corps Ltd. v. Int'l Collectors Soc.*, 15 F.Supp.2d 456, 473–76 (D.N.J.1998); *Fair Automotive Repair, Inc. v. Car–X Serv. Sys., Inc.*, 128 Ill. App.3d 763, 84 Ill.Dec. 25, 471 N.E.2d 554, 561 (2d Div.1984). Others rely upon constructions of the hearsay rule which classify as hearsay a statement made by a party's agent concerning a matter within the scope of the agency or employment. See *Quintana v. City of New York*, 259 A.D.2d 296, 686 N.Y.S.2d 408, 409 (N.Y.App.Div.1999)(citing *Niesig, supra* ).[2]

---

**2.** One of the cases cited by defense counsel rejected the proposition that a "party" for the purposes of Rule 4.2 should include the persons capable of making an admission under the hearsay rule. *See Dent v. Kaufman,* 185

As discussed elsewhere in this opinion, South Dakota law is crucially different on both counts. The remainder of defense counsel's cases involved contact between attorneys and parties' employees either before litigation began, or after the employees had stopped working for the parties. This case does not present either situation.

The interviews with "Bill", a salesman for Plaintiff, do violate the standards now clearly established by the Court. The statements taken from Bill were in part an attempt to elicit admissions against his employer, the Plaintiff. The interview with Bill would be prohibited under the fifth circumstance set forth above as the investigator was intended by the defense counsel to elicit admissions. A standard only now being clearly established is not the basis for these sanctions. The sanctions are supported by the interviews which took place under false pretenses, as such interviews are clearly prohibited by Rule 4.3 of the South Dakota Rules of Professional Conduct.

As to the investigator's tape recorded encounter with Jon Becker, the Court adopts ABA Formal Opinion 95–396, which states (emphasis added):

> Rule 4.2 prohibits a lawyer from knowingly communicating *with a represented person* about the subject matter of the representation *without the consent of that person's lawyer*. This prohibition applies to the conduct of lawyers in both civil and criminal matters, *and covers any person known to be represented by a lawyer with respect to the matter to be discussed.*

The ABA's Formal Opinion 95–396 goes on to state:

A lawyer may not direct an investigative agent to communicate with a represented person in circumstances where the lawyer herself would be prohibited from doing so. Whether in a civil or a criminal matter, if the investigator acts as the lawyer's "alter ego," the lawyer is ethically responsible for the investigator's conduct.

Attorneys Damgaard and Shattuck were ethically prohibited from contacting Jon Becker, owner of A–Tech, a represented person in the matter before the Court, without consent of A–Tech's attorney, Daniel Lias. Because the attorneys could not contact Becker directly without permission, the investigator could not do so either. For that reason, the Court granted A–Tech's motion for sanctions.

### Surreptitious Recording

 It is not illegal in South Dakota for one party to a conversation to record the conversation without the other party's knowledge or consent. *State v. Braddock,* 452 N.W.2d 785, 788 (S.D.1990) ("[T]he consent of one party to the recording of a communication takes that communication out of the scope of SDCL ch. 23A–35A, whether the communication is oral or by wire.") It is, however, unethical for an attorney or his investigator or other agent to record a conversation without the other party's knowledge or consent because such conduct involves deceit or misrepresentation. *See Parrott v. Wilson,* 707 F.2d 1262, 1271 (11th Cir.) (while tape recording is not illegal, code of conduct imposes higher standard than mere legality), *cert. denied,* 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); *Roe v. Operation Rescue,* 1989 WL 66452 at * 3 (E.D.Pa.1989), *aff'd* 898 F.2d 142 (3rd Cir.) (Table), *cert.*

W.Va. 171, 406 S.E.2d 68, 72–73 (1991). As discussed in the text above, however, Rule 4.2 must be interpreted in light of the hearsay rule, in this case Federal Rule of Evidence

801(d)(2)(D), in order to prevent unfairness to opposing parties. *See Cole v. Appalachian Power Co.,* 903 F.Supp. 975, 978–79 (S.D.W.Va.1995).

*denied,* 498 U.S. 958, 111 S.Ct. 385, 112 L.Ed.2d 396 (1990); *Miano,* 148 F.R.D. at 76; ABA Committee on Ethics and Professional Responsibility, Formal Op. 337 (1974) (ruling that "no lawyer should record any conversation whether by tapes or other electronic device, without the consent or prior knowledge of all parties to the conversation."); ABA Committee on Ethics and Professional Responsibility, Informal Op. 1320 (declining to reconsider Formal Op. 337 and specifically ruling that lawyer's conduct in causing investigator to tape record conversation between investigator, who knows tape recording is being made, and sales clerk, who does not, is unethical). Although the American Bar Association's Formal Opinions do not carry precedential weight, courts look to them for guidance in interpreting the Model Rules. *Aiken v. Business and Industry Health Group, Inc.,* 885 F.Supp. 1474, 1478 (D.Kan.1995); *Olson v. Snap Products, Inc.,* 183 F.R.D. 539, 544 (D.Minn.1998); *In re United Mine Workers of America Employee Benefit Plans Litigation,* 156 F.R.D. 507, 511–12 (D.D.C.1994). Thus, the investigator's conduct, at the direction of Mr. Damgaard and Mr. Shattuck, in tape recording the conversations without the consent of sales person Bill at Elliott and of Jon Becker at A–Tech violated

Rules 4.2, 5.3 and 8.4 because "the undisclosed use of a recording device is an element of deception, artifice, and trickery which does not comport with the high standards of candor and fairness by which all attorneys are bound." *People v. Selby,* 198 Colo. 386, 390, 606 P.2d 45, 47 (1979).[3]

Having determined the existence of ethical violations by attorneys Damgaard and Shattuck, the Court must fashion appropriate sanctions. The Court has an obligation to take measures to prevent unethical conduct from occurring in any proceeding, *Sequa Corp. v. Lititech, Inc.,* 807 F.Supp. 653, 659 (D.Colo.1992), and broad discretion in fashioning an appropriate remedy. *Faison,* 863 F.Supp. at 1215. *See also Chambers v. NASCO, Inc.,* 501 U.S. at 50, 111 S.Ct. 2123.

The strength of the sanction in this case must be tempered by the unsettled nature of some of the governing law. There is nothing unsettled about the prohibition on lawyers taping conversations under these circumstances, or about the ban on lawyers contacting represented parties without the permission of counsel. It is likewise clear that lawyers may not simply use non-lawyers to carry out these prohibited acts. However, the use of an investi-

3. It was disclosed on September 22, 1999, that Don Elliott, the president of the Plaintiff corporation, was recording telephone conversations with employees of the Defendant from January to June 20, 1999. The lawsuit was commenced on June 9, 1999. The record does not indicate that these recordings made in South Dakota of telephone conversations with Defendant's employees in Minnesota were either directed by or known of by Plaintiff's counsel while the recordings were being made. Mr. Elliott subsequently disclosed the recordings to his counsel and they were ultimately provided to defense counsel, with there being a dispute as to whether they were timely provided. Despite a late claim just now made by defense counsel of unclean hands on the part of Plaintiff's counsel, the

record shows no improper acts by Plaintiff's counsel. However, as a matter of instruction, surreptitious recordings by clients will be briefly discussed. Since both South Dakota and Minnesota law allow recordings with one party consent, it has not been shown that any of these surreptitious recordings were prohibited by state statute. No claim or inquiry has been made concerning regulatory limitations on telephone recordings. Even if acts are not prohibited by state law, that does not mean that investigators or clients can do what lawyers themselves cannot do because of ethical limitations. Once an attorney-client relationship is established, clients should be warned of those limitations even though failure to do so, in and of itself, is no basis for sanctions.

gator to attempt to elicit damaging admissions from the opposing party's employees was an area of the law which had not been specifically addressed in South Dakota. "When imposing sanctions for ethical violations in unclear areas of law, the relevant issue to consider is not whether ... counsel incorrectly interpreted the law, but whether counsel ignored the unsettled nature of the law." *Belote,* 1998 WL 136523, at *7. As they treaded into this area, defense counsel were obliged to proceed with caution. Before directing their investigator to make *ex parte* contacts with represented parties, defense counsel should have asked permission of counsel, or sought guidance from this Court. *See id.; Terra,* 913 F.Supp. at 1309. Considering that one of the main ethical issues in this case was unsettled at the time of defense counsel's conduct, the Court finds that evidentiary sanctions provide the necessary sanction. The Court has already excluded from evidence at trial the audiotaped recordings made by the investigator, any testimony from the investigator, his wife and his daughter, and any other evidence obtained by the defense as a result of the audiotaped conversations. *See Hill,* 123 F.3d at 1120–21; *Holdren,* 13 F.Supp.2d at 1197. These sanctions were sufficient to prevent prejudice to Elliott Power Sports. A–Tech Cycle settled its case and there was no claim that it was prejudiced in that case.

The sanctions in this case were relatively light because some aspects of the law were unclear. If counsel practicing before this Court commit similar ethical violations in the future, however, the sanctions imposed will not be so lenient. The Court regrets having to name capable defense lawyers in a published opinion. But these lawyers and others practicing before the Court must be aware of and observe the ethical requirements by which they are bound, so that the practice of law remains an honored profession, not only in our eyes, but in the eyes of the public as well. Accordingly,

IT IS ORDERED that no additional sanctions will be imposed.